**PRUDENCE–BONDS CORP. et al. v. STATE STREET TRUST CO. et al.**

No. 77, Docket 22138.

United States Court of Appeals Second Circuit.

Argued Nov. 9, 1951.

Decided Dec. 5, 1951.

Reargued April 15, 1952.

Decided March 3, 1953.

Charles M. McCarty, New York City, George C. Wildermuth, Samuel Silbiger, Brooklyn, N. Y., and Nemerov & Shapiro, New York City, (Aaron Schwartz, New York City, of counsel), for appellants.

Peabody, Arnold, Batchelder & Luther, Boston, Mass., Milbank, Tweed, Hope & Hadley, New York City (Willard B. Luther, Boston, Mass., A. Donald MacKinnon, New York City, John S. Whipple, Boston, Mass., and William E. Jackson, New York City, of counsel), for appellees.

Before SWAN, Chief Judge, FRANK, Circuit Judge, and COXE, District Judge.

FRANK, Circuit Judge.

1. We assume, arguendo (1) that, to give the bankruptcy court jurisdiction, it was not necessary that the guaranty (or the proceeds of its enforcement) be part of the debtor's assets,[1] and (2) that, in fact, the guaranty constituted part of the mortgaged property.[2] Even so, we think the court, as a bankruptcy court, lacked jurisdiction on the facts here because (a) that jurisdiction could exist only if the suit were a representative action[3] for restoration of the trust fund, and (b) under pertinent New York decisions, such a representative action cannot rest upon the indenture. trustee's breach where that breach consists merely of inaction—here the failure to enforce the guaranty. Those New York decisions control us, although, as we once pointed out, they may lead to most undesirable results.[4] Our discussions in earlier cases[5] render it unnecessary here to canvass in detail Smith v. Continental Bank, 292 N.Y. 275, 54 N.E. 2d 823, and related decisions. Suffice it to say that, if the inaction of the trustee in the Smith case could give rise to personal suits only, i. e., not a representative suit for restoration of the fund, then surely the same must be true of the trustee's inaction here. Appellant urges that the Smith case dealt solely with an individual bondholder's suit at law for his personal loss, and that, for the trustee's misconduct alleged in that suit, a representative action for restoration of the fund could also have been maintained against the trustee. We do not agree. The

1. Cf. Brooklyn Trust Co. v. Kelby, 2 Cir., 134 F.2d 105, 110–112.

2. Appellant argues thus: (1) Once the bank, as trustee, obtained the guaranty, that guaranty became part of the mortgaged or trust assets, regardless of niceties of phrasing in the trust agreement. (2) This case is unlike President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 478, where the trustee neglected to enforce a covenant to deposit a guaranty.

3. Brooklyn Trust Co. v. Kelby, 2 Cir., 134 F.2d 105, 110–112; Manufacturers Trust Company v. Kelby, 2 Cir., 125 F.2d 650.

4. Phelan v. Middle States Oil Corp., 2 Cir., 154 F.2d 978, 999–1001. There we referred particularly to the aspect of the New York rule concerning transfers. We said: "According to those decisions, where a trustee * * * has violated his duties but in such a way as not to involve a release or surrender of any trust assets, the right of action * * * belongs to the persons who owned the bonds at the time of the commission of the wrong; and such a right, without an express assignment thereof, does not pass to the purchaser of any of the bonds, although the seller had no knowledge whatever of the trustee's dereliction. * * * We have found no other jurisdiction in which that doctrine prevails, especially where a sale of negotiable instruments is involved. * * * [T]he New York doctrine has this undesirable practical result: The seller of such bonds—ex hypothesi unaware, at the time of the sale, of the wrong done by the trustee—in actual fact can have no notion of retaining any cause of action against the trustee; and the seller of a bearer bond is exceedingly hard to trace. The practical consequence of the New York rule therefore is that most of the claims against a trustee for wrong done, especially to holders of bearer bonds, will never be prosecuted unless the trustee has surrendered trust assets. That rule thus often serves, pragmatically, as a convenient means of trustee exculpation."

5. See, e. g., President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 474–475, 478; York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 521; Elias v. Clarke, 2 Cir., 143 F.2d 640, 644; Phelan v. Middle States Oil Corp., 154 F.2d 978, 999–1001; Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, 652–654.

New York courts, as we understand them, hold (a) that such inaction does not amount to a "release or surrender" of any mortgaged property, and that, without a "release or surrender," personal, individual suits only—not a representative suit for "restoration of the fund"—may be maintained; and also (b) that any such individual suits must be brought by those who held bonds at the time of the trustee's breach, not by subsequent transferees of the bonds (absent express assignments to them of the individual claims against the trustees). We think that (b) results from (a), not vice versa. Accordingly, nothing in the recent New York statute, Personal Property Law, McK.Consol.Laws, c. 41, § 41 (1950), wiping out (b) as to transfers made after September 1, 1950, would affect our decision, even if that statute were retroactive.[6]

2. We agree with the master and the district judge that there is no merit in appellant's objection to the trustee's surrender of $10,000 in cash for cancelled bonds. The trust agreement did not require, as a condition of such a surrender, compliance with conditions contained in the agreement but applicable to other types of releases.[7]

Affirmed.

6. Appellant argues that the history of that statute includes our criticism, in the Phelan case, 2 Cir., 154 F.2d 978, 1001, of the New York rule as to the non-passing of individual claims where the trustee has not "surrendered assets." We based that criticism on the fact that this rule, in practice, meant exculpation of trustee in many cases of gross negligence. True, such exculpation may well still ensue unless the legislation also wiped out the New York decisional rule that a representative suit for restoration of the fund may not be maintained unless the trustee has "surrendered assets," for few individual suits are ordinarily brought. But in Phelan v. Middle States Oil Corp., supra., we happened not to be concerned with and did not mention that aspect of the New York rule. We think the legislature did not change it. See 1950 Leg.Doc. 65 (D.).

7. The pertinent provisions read as follows: "Substitution and Withdrawal of Securities, Etc.

"The Corporation at any time and from time to time may withdraw any bond, mortgage or other securities or certificates of deposit or cash from the trust fund, as follows: (1) By substituting for the item or items withdrawn, any other security or other item enumerated in Section 1 of this Article, equal in amount or value, to the unpaid principal of the bonds, mortgages or other securities or cash withdrawn. (2) By written application of the Corporation to the Trustee, for such withdrawal, at any time when the principal amount of the trust funds may exceed the par value of the Prudence Bonds then issued and outstanding hereunder.

"In either such case, the Trustee shall deliver to the Corporation the bonds, mortgages or other securities or cash, so to be withdrawn, with any necessary assignments thereof, provided there shall remain in the trust fund after any such withdrawal bonds, mortgages or other securities or cash equalling in amount or value not less than the principal amount of Prudence Bonds then issued and outstanding hereunder, and provided, further, that if and so long as any securities deposited in the trust fund enumerated in paragraphs (a), (b), or (c) of Section 1 of this Article, shall be in default in the payment of principal, the Corporation shall be permitted to withdraw only such securities deposited under said paragraphs (a), (b), or (c) as shall be in default, except that the Corporation may withdraw any of the items enumerated under paragraphs (a), (b) or (c) in connection with the redemption or final payment at maturity, of any such items. The Trustee may accept as conclusive the written statement of any officer of the Corporation as to whether or not any securities deposited in the Trust Fund are in default in the payment of principal.

"Upon the delivery to the Trustee for cancellation of any or all of the Prudence Bonds secured hereunder, with all unmatured coupons attached thereto, or cash equal to such coupons as are not delivered, or in lieu of such bonds and coupons or cash, a certificate by an officer of the Corporation approved by an officer of the Prudence Company, Inc., that certain of such bonds, with the coupons, if any, belonging thereto, matured at a date earlier than six years prior to the date of said certificate, and have not been presented for payment, the Corporation shall be entitled to withdraw from the trust fund, and the Trustee shall deliver to the Corporation, bonds, mortgages or other securities, or cash, enumerated in Article I, equal in amount and value to the principal amount of Prudence Bonds so delivered for cancellation and/or rep-

## On Rehearing

Before SWAN, Chief Judge, L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by Prudence-Bonds Corporation (which we shall call the New Company), from the order of a court of bankruptcy in a proceeding under § 77B, Bankr.Act, 11 U.S.C.A. § 207, passing the account of the State Street Trust Company (which we shall call the Trustee), as trustee of three mortgages, pledged to secure the "Tenth Series" of negotiable bonds, issued by the original Prudence-Bonds Corporation (which we shall call the Debtor). On December 5, 1951, we dismissed the appeal on the ground that we had no jurisdiction over an attempted surcharge by the New Company of the account of the Trustee; the New Company has asked for a rehearing and the appeal has been reheard both by argument and briefs. Although Judge Inch's opinion in the District Court, 101 F.Supp. 729 states the facts in detail, it will make our discussion clearer, if we give a renewed outline of them. Prudence Company, Inc. (which we shall call the Guarantor) owned a large number of real estate mortgages, and sold them to the Debtor in exchange for ten or more "series" of negotiable bonds to be issued by the Debtor. As security for the tenth of these "series" the Debtor and the Trustee entered into a contract (which we shall call the Indenture), by which the Debtor assigned to the Trustee three of these mortgages, which with other property constituted a trust *res*. The Guarantor was not a party to the Indenture, but at the same time it executed a collateral agreement with the Trustee (which we shall call the Primary Guaranty), guaranteeing payment of the "Tenth Series" bonds, principal and interest, as they fell due. It was one of the Debtor's covenants in the Indenture that the Guarantor would also deposit a guaranty with the Trustee that the principal of any mortgages assigned to it by the Debtor should be paid by the mortgagors within eighteen months after it fell due, and that the interest should be paid when due. The Indenture, including the Primary Guaranty was executed on May 1, 1927; and on the 27th of July, 1928, the Guarantor deposited with the Trustee a guaranty (which we shall call the Secondary Guaranty) of the payment, as aforesaid, of any mortgages held as security. The mortgagors in one of the three mortgages that were part of the *res*, defaulted in the payment of its principal, and the default continued for more than eighteen months, during which period the Guarantor was solvent and could have performed the Secondary Guaranty. The Trustee filed its account in the reorganization proceeding at bar and prayed the court to settle the account and discharge it from further liability. The New Company which had succeeded to all the rights of a reorganization trustee, surcharged the account with the loss on the defaulted mortgage, the Guarantor having itself become insolvent shortly after the Debtor. Two questions arise: (1) Whether the New Company has any standing to enforce the Secondary Guaranty against the Trustee; and (2) if it has, whether its claim against the Trustee is good on the merits. In the decision that we are now rehearing, we assumed that the standing of the New Company to sue upon the claim must be determined under the law of New York, and that the courts of that state had held that, in situations like this, arising out of the neglect of a trustee to protect the *res,* as contrasted with a surrender or release of it, there arise only individual and separate claims of which the bondholders are severally the obligees, and which a reorganization trustee has no standing to assert. For that reason we dismissed the appeal, and had not occasion to consider the merits of the surcharge.

resented by the certificate above mentioned."

The second paragraph relates to the preceding (1) and (2), for it begins,

"In either such case * * *" The third paragraph is not similarly restricted by the conditions found in the second paragraph.

We have concluded that we were mistaken in assuming that the New Company had no such standing. The bondholders did of course have a direct claim against the Debtor by virtue of its promise to pay their bonds, just as they had a claim against the Guarantor upon the Primary Guaranty; but on this appeal we are concerned with neither. In addition they had claims against the Trustee under the Indenture; but these were only as beneficiaries of the trust, except as the Trustee made any express covenants in addition to its obligation as trustee. The Secondary Guaranty was a part of the res, as we shall show when we come to consider the merits; it was in substance an insurance by the Guarantor of performance of their promises by the mortgagors of the three mortgages—a sort of credit insurance. When the Trustee after notice of default upon one of these three mortgages—with which alone this appeal is concerned—failed to take any steps to enforce the Secondary Guaranty of which it was the obligee, it defaulted in its duty as trustee and became liable to the bondholders for any loss that resulted, except as the exculpatory clauses of the Indenture excused it; and, since the result turns upon the meaning of those clauses, our jurisdiction depends upon whether the New Corporation has any standing to press the claims of the bondholders for this breach. The Trustee says that the New Company has no such standing because by the law of New York, which controls the rights of the parties, the breach was at most a failure properly to protect a part of the res—i. e., to compel the Guarantor to perform the Secondary Guaranty—and not a "surrender or release." We agree that it was not. The Trustee next argues that the Court of Appeals of New York has several times decided that at the time of the events here in suit a bondholder's claim for such a breach did not pass with a transfer of the bond, but remained with the transferrer; and, further, that the claim even of those

bondholders, who may not have bought their bonds after the breach, is personal to them severally, on which they must sue as primary obligees and which a trustee in reorganization under § 77B of the Bankruptcy Act may not assert on their behalf. Hence the District Court was without jurisdiction over the New Company's surcharge.

There can be no doubt that, until it was changed by statute, it was the settled doctrine of New York that in such situations a claim against a trustee for breach of his duty to protect the res, did not pass by transfer of the bond but remained the property of the transferrer;[1] and the same doctrine was applied to transfers of "participation certificates" which did not secure a debt, but were direct and beneficial interests in the res.[2] We held in Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F. 2d 650 that this doctrine did not apply to a breach that was a "surrender" or "release" of any part of the res; and so far the parties are apparently on common ground. At any rate we will not reconsider that decision. Two questions therefore arise: (1) whether those bondholders who bought their bonds after the first breach here in suit have any claim against the Trustee; and, assuming that they have none, (2) whether the New Company has any standing to surcharge the Trustee's account on behalf of bondholders who bought their bonds before the breach. The New Company argues that the New York doctrine does not apply at all, because the Trustee was a Massachusetts corporation, because it accepted the Indenture in Boston where the bonds were payable, and because the New York doctrine is contrary to the law of Massachusetts. The Trustee answers that the law of the two states is the same; and that, if it were not, the suit does not concern the interpretation of the Indenture or its performance, as to which alone the law of Massachusetts would control; but that it concerns the effect of a transfer of the bonds, and what standing the New

1. Elkind v. Chase National Bank, 284 N.Y. 726, 31 N.E.2d 198; Smith v. Continental Bank & Trust Co., 292 N.Y. 275, 54 N.E.2d 823.

2. Hendry v. Title Guaranty & Trust Co., 280 N.Y. 740, 21 N.E.2d 515.

Company has to represent any of them— that last being a question of remedy which the *lex fori* controls.

We do not find it necessary to decide what was the effect of a transfer of any of the bonds in New York: *i. e.*, whether the claim of the transferrer remained his or passed to the transferee; we shall assume *arguendo* that the ordinary doctrine applies to such transfers: *i. e.*, that the law of the place of transfer determines what passes by the transaction,[3] although the *lex loci contractus* determines whether a chose in action may be transferred at all.[4] We can avoid any decision as to what law governed any transfer, because, as will appear, we think that on the merits the Trustee must win, and we are now concerned only with our jurisdiction to decide the merits. We do assume, as we have warrant for doing, that there were some at least of the bondholders on July 29, 1934, when the petition herein was filed, who had bought their bonds before May 28, 1930, when the mortgagor of the mortgage in question first defaulted in the payment of interest. (There was indeed a default in the payment of principal a year earlier, but the Secondary Guaranty imposed no duty upon the Guarantor for such a default until it had continued for eighteen months.) In the absence of any proof to the contrary we hold that there was ground for a finding that some of the bonds in suit were bought before May 28, 1930.

However, the fact that there were some such bonds does not answer the other question: *i. e.*, whether the New Company may represent these bondholders in asserting their rights against the Trustee. That is not, as the Trustee argues, a question of remedy and on that account one to be determined by the *lex fori;* on the contrary, it is a question as to whether the New Company was a proper party to represent these bondholders upon the Trustee's accounting; and it depends upon Rule 17 of the Rules of Civil Procedure, 28 U.S.C.A., which General Order XXXVII, 11 U.S.C.A. following section 53, made applicable to proceedings in Bankruptcy, "as nearly as may be." Subdivision a of that rule declares among other things that "a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought". An order of the District Court entered on July 12, 1939, upon our mandate entered upon our opinion in Central Hanover Bank & Trust Co. v. President and Director of Manhattan Co., 2 Cir., 105 F.2d 130, provided as follows: "any objections * * * of the new Prudence Bonds Corporation to the accounts filed herein by the Corporate Trustees ' * * * shall be deemed and constituted to be made on its own behalf and on behalf of all holders * * * of the respective Series of Bonds to which any such objections * * * relate." We think that this provision was authorized by subdivisions f and h of § 77B which upon confirmation of a plan by a judge, gave to "the debtor and other corporation * * * organized * * * for the purpose of carrying out the plan * * * full power * * * shall put into effect and carry out the plan and the orders of the judge * * * thereto". These provisions were amplified by subdivisions (13) and (14) of § 216 of Chapter X, 11 U.S.C.A. § 616, so as to leave no doubt of the broad *implementary* powers of a judge when a plan is confirmed; and, although Chapter X appears never to have been extended to the reorganization here at bar, we regard the later provisions as no more than a clarification of subdivisions f and h of § 77B. Therefore, we hold that the order of July 12, 1939, issued as it was under the authority of the act, made the New Company a "party authorized by statute" to "sue in his own name" under Rule 17(a); and, our jurisdiction being established, we may proceed to the merits.

■ As we have already said, we regard the Secondary Guaranty as part of the *res*. It was executed more than a year after the Indenture, although it bore the same date, and the fact that it was not in existence at the time may well account for the failure to recite it as part of the mortgaged property in §§ 1 and 2, Article I. In § 1 of Article III the Debtor made a

3. Restatement of Conflict of Laws, § 350.

4. Restatement of Conflict of Laws, § 348.

number of covenants "exclusively for the benefit of the Trustee and the holders of Prudence-Bonds, Tenth Series," among which subdivision f read: "That it will deposit with the Trustee a guarantee of The Prudence Company guaranteeing payment of interest semi-annually when due, and of principal within eighteen months after the same becomes due, according to the terms of each bond, mortgage or other security in the Trust Fund." The Secondary Guaranty when made conformed to this covenant, and the Debtor deposited it with the Trustee in performance of it. Whether the Primary Guaranty was also a part of the *res* is another question, and we need not answer it, for it was a promise to the bondholders to pay the Debtor's obligations, and had nothing to do with the *res*. But by the Secondary Guaranty the Guarantor became a surety for the performance of the mortgagors, just as the mortgages were a surety for the same performance. The only difference between them was that in one case the security was the promise of a third person and in the other it was a lien upon property. The promise was a part of the *res* in precisely the same sense that the promises were in the policies of fire and title insurance, mentioned in Article I, § 2. As we have said, it was in effect the equivalent of a policy of credit insurance of the mortgagors.

The Trustee invokes three clauses of the Indenture to excuse its failure to enforce this Guaranty: (1) § 5 of Article I; (2) § 1(d) of Article IV; and (3) § 1 of Article V. These we will consider in that order. Section 5 of Article I begins by declaring that the Guarantor or the Debtor may collect "the securities constituting the trust fund" and may enforce any "agreements" that they "contain." Next it declares that, if the Debtor asks the Trustee in writing to do so and indemnifies it, it "shall enforce * * * any and all of the covenants and agreements contained in said securities or any or either of them for the benefit of the holders of Prudence bonds, issued and outstanding hereunder or" (for the benefit?) "of the Corporation" (the Debtor) "or of the Prudence Company

Inc." (the Guarantor). This sentence would excuse the Trustee only in case the Secondary Guaranty was an "agreement" "contained" in some of the "securities" "constituting the trust fund"; and, if we are right in holding, as we just have done, that the guaranty was a part of the trust *res*, the words cover it, again as much as they cover a fire, or title, insurance policy. It seems to us quite unwarranted to distinguish between the "trust fund" and the trust *res*. On the other hand, the New Company argues that in any event the section means no more than that the Trustee shall be indemnified, if the Debtor should ask it to sue upon any such "agreements," and that it did not excuse a failure by the Trustee to seek indemnity for pressing its claim against the Guarantor upon its default; in short, it did not excuse complete inaction by the Trustee. If this section stood alone, we might hesitate to say that it created an excuse. However, when read in conjunction with § 1 of Article V, it confirms our conclusion, depending upon that section, that the Trustee meant to obtain a general immunity from any liability for nonfeasance.

Next is the second whole paragraph of § 1 of Article IV, which concludes by declaring that "no rights or remedies under this Article shall or may be exercised by the Trustee * * * unless and until The Prudence Company Inc. shall have failed to fulfill some obligation in said guarantee contained." Not only does the preceding language of this section show that the "said guarantee" could only mean the Primary Guaranty, but, it would have been *brutum fulmen* for the Trustee to enforce the Secondary Guaranty after the Guarantor had defaulted on the Primary. Besides, the definition of "events of default" does not include a default on the Secondary Guaranty, and the section touches only such defaults. We agree, therefore, that this section did not excuse the Trustee.

Article V of the Indenture was entitled: "Concerning the Trustee"; and § 1 was entitled: "Trust Conditions." It begins by declaring that the Trustee need not "enforce any of the provisions contained in any of the securities deposited in the

Trust Fund, or towards the execution or enforcement of the trust hereby created," unless it gets indemnity. So far, as in the case of § 5 of Article I, it would be possible to construe this language as intended to do no more than give the Trustee the privilege of insisting upon indemnity before it undertook any "execution or enforcement of the trust"; but not as excusing it from nonfeasance. The following language, however, unequivocally does excuse the Trustee from any initiative, until it gets notice of some default or "event of default" from at least twenty-five per cent of the bondholders. The words are: "nor shall the Trustee be required to take notice of any default, or 'event of default,' hereunder, and it may, for all purposes conclusively assume that there has been no default, or 'event of default,' hereunder, * * * nor shall the Trustee take any action in respect to any default or 'event of default' unless requested to take action" by the bondholders, and unless indemnified by them. A breach of the Secondary Guaranty is not, as we have said, an "event of default"; and therefore the excuse does depend upon the meaning of "default * * * hereunder," when used in contrast with "event of default." We think that such "defaults" included a breach of the Secondary Guaranty. In the first place it is noteworthy that in describing the occasions on which the Trustee might demand indemnity, the words were: "provisions contained in any of the securities deposited in the Trust Fund, or towards the execution or enforcement of the trust." That is of course a different locution from "default or 'event of default'"; but to construe the second as less comprehensive would mean that there were some duties of the Trustee in enforcing the trust, that, although they were conditional upon being indemnified, it was bound to initiate *sua sponte* if it learned of them, except in cases where they were a "default or 'event of default' hereunder," when it need not stir unless the bondholders requested it to do so. Conceivably there could have been some basis for such an apparently meaningless distinction; but if in fact it was intended we cannot be-

lieve that it would have been expressed in such nebulous fashion. Be that as it may, the language of the excuse appears to us explicit. The contrast between "default" and "event of default" shows that the first term added something to the second; and, had it not been for the suffix "hereunder" which applied to both, we can see no ground to doubt that it covered any kind of failure in the security for the *res*. If, as we hold, the Secondary Guarantor was a part of the *res*, the only verbal difficulty in reading a breach of it as a "default * * * hereunder" is that it was not physically comprehended in the Indenture. But it was comprehended by § 1(f) of Article III, for that, as we have seen, was a promise of the Debtor to "deposit" it with the Trustee. The objection comes therefore to no more than this: that a breach of it could not be a default "under" the Indenture, because, although the Indenture had provided for it, and although it was as much a part of the security for the bonds as the mortgages and fire and title insurance policies, it was not in existence at the time, and could be included "thereunder" only by a promise *in futuro*. Unless there is some reason which compels us deliberately to defeat what would be the unavoidable construction of the words in any other document, we cannot accept this argument.

Our conclusion is confirmed, not only by the words of § 1 of Article V which immediately succeed those we have been discussing, but by § 1(i) of Article III. The succeeding words were as follows: "The foregoing provisions of this Section are intended only for the protection of the Trustee," and are not to be taken in derogation of its powers or discretion to act without any demand by the bondholders. Here the intent plainly was to give the Trustee an immunity in all such cases, but nevertheless to leave it the initiative, if it chose to take it. We cannot think it possible with this purpose in mind, that the parties intended to make the Secondary Guaranty a single exception; so that, although the Trustee was to be protected against every other nonfeasance he was not to be protected against this. Since the

Trustee was in any event completely protected if it failed to take any action against the mortgagors on their default, if the Guarantor had become insolvent before the mortgagors defaulted, the Trustee need not have taken any action whatever. The Indenture would have protected it as to the mortgagors and the insolvency would have protected it as to the Guarantor. Such a result could scarcely have been intended. Turning next to § 1(i) of Article III, it there appears that the Debtor was bound to furnish to the Trustee on the tenth day of each month written statements of—among other facts—the amount of principal collected during the preceding month on any of the mortgages in the Trust Fund. Then followed this sentence: "The Trustee shall be under no duty to take action upon any such statement or to see to the receipt thereof by it": that is, the Trustee was excused from action upon the information, or from getting it from the Debtor. We cannot see how in the face of this clause the Trustee can be held for nonfeasance for any default of the Guarantor on the Secondary Guaranty. It is true that the Debtor was not bound to state what interest had been paid during the preceding month, but that was to be expected, for the Trustee, like any other pledgee, was not entitled to any usufruct from the pledged property—the mortgages—until it took possession of them either under a power reserved, or by a receiver.

For the foregoing reasons we should have no doubt that the Indenture excused the Trustee, if the question arose upon an ordinary contract between it and the bondholders themselves. That, however, was not the case, for the contract bound them only through these words incorporated in each bond: "Reference is hereby made to said Trust Agreement for * * * the rights and remedies of the Trustee and the respective holders of said Prudence-Bonds,

the rights of the corporation and the terms and conditions under which said bonds are secured, issued and guaranteed, and the holder hereof is bound thereby." The duty to care for the *res* [5] and the realization of claims which the trustee holds in trust,[6] are indeed inherent in the relation; and, although provisions are valid that exculpate a trustee for neglect of such duties, so long as that is not due to "reckless indifference," they are "strictly construed."[7] If that phrase means that nothing may be implied which is not literally expressed, the Indenture did not protect the Trustee, for exculpatory provisions nowhere actually mention the Secondary Guaranty. That is not, however, the meaning of this canon; although they were used of a statute, the often quoted words of Holmes, J. apply with even greater force to a contract: "The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and we shall go on as before.[8]" It is as impossible to lay down any postulates for "strict construction" as it is for ordinary "construction." When parties have not explicitly covered the occasion which has arisen, a court will always strive to ascertain whether their disclosed purpose does not demand a more inclusive "intent." And by their "intent" we can understand nothing else than how they would have disposed of the occasion had they been faced with it at the outset.[9] There is a hazard about doing that; but it is inevitable if the purpose is not often to be defeated and all courts do it more or less. When we say that we will adopt a "strict construction," we mean that we will press with unusual persistence the doubts that cannot but inhere in the function anyway, and that we will be satisfied with no exten-

---

5. § 174, Restatement of Trusts.

6. § 177, Restatement of Trusts.

7. § 222, Restatement of Trusts.

8. Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194.

9. A. Leschen & Sons Rope Co. v. May-flower G. M. & R. Co., 8 Cir., 173 F. 855, 857, 35 L.R.A.,N.S., 1; Sternberg v. Drainage District, 8 Cir., 44 F.2d 560, 562; Rudy-Patrick Seed Co. v. Kokusai etc. Kaisha, 85 F.2d 17, 20; D. H. Pritchard Inc. v. Nelson, 4 Cir., 147 F.2d 939, 942.

sion of the literal meaning unless it satisfies every logical compunction. In the case at bar we have stated as best we can those considerations that have removed any doubt in our minds that the parties meant to give complete immunity to the Trustee for any nonfeasance in suing either the mortgagors or the Guarantor.

One thing further it may be well to mention. The Special Master in passing upon the merits appears to have laid stress upon the fact that, beginning late in 1928, the Trustee and the Debtor carried on a correspondence about the default upon the mortgage here in question—the "Guyon Mortgage." From this he reasoned, as we understand it, that the parties had put a practical construction upon the Indenture which showed that the Trustee conceded that it was under some duty to take action upon the Secondary Guaranty. Assuming for argument that there might be force in this if the Indenture had not provided otherwise, the language, already quoted, from § 1 of Article V, is in our judgment a complete answer to the inference. It will be recalled that the exculpatory provisions of that section were stated to be "intended only for the protection of the Trustee" but that they "shall not be construed to effect any discretion or power to determine whether or not it shall take any action in respect of any default or 'event of default.'" Since the Trustee was therefore to be free, though expressly not bound, to sue upon the guaranty, we are quite unable to find in the correspondence an acknowledgment of liability.

Perhaps it ought not to be permissible to issue bonds, secured by indentures that contain such provisions for immunity. That depends upon how much care and attention those who buy the bonds expect from such trustees. We do not see how it is possible to pass on that question in the abstract; if we were to guess, we should say that they expect very little, though

they do expect no action which will positively impair their interests. Besides, whatever may have been the proper duties to impose at the outset, so far as we are aware indentures containing such clauses have been uniform up to the present time; and any abuses that they have permitted have neither induced legislatures to intervene, nor courts to make an exception. Save for the stricter canon which we have mentioned, bondholders, like others who accept a written contract, have been charged with notice of all that it contains, whether they read it or not. It may be that in time courts will take a more protective view, though obviously there are two sides to the question; but to us it seems that a custom that has secured such long recognition should be left for correction to legislative inquiry and action.

Order affirmed.

FRANK, Circuit Judge (dissenting).

I agree that (contrary to our original opinion on this appeal) the district court had jurisdiction.[1] But I disagree with my colleagues' decision on the merits. To illuminate my reasons for dissenting, I shall first state briefly the following salient facts:

(1) The debtor company was an affiliate of (*i. e.*, a creature of the same company that controlled) Prudence Company, Inc., the sponsor of all the many Prudence-Bonds "series" of bonds, which the sponsor sold to investors. (2) The sponsor's guaranty of payment of the securities deposited with the trustee for the benefit of the bondholders (the guaranty my colleagues call the "Secondary Guaranty") expressly recites that the sponsor, having acquired them, "is arranging to sell and deliver all of said Prudence-Bonds and in order to induce the purchase thereof" has agreed to make that guaranty. It is thus obvious that the sponsor, in selling these bonds to the public, used the Secondary

1. I would not, however, limit the jurisdiction to the claim based on bonds purchased before May 28, 1930, because I think the New York courts would not apply the unique New York doctrine even as to bonds transferred in New York, where, as here, the trustee is a trust company incorporated and authorized to do business in Massachusetts, the trust was there accepted, and the bonds were there issued and payable.

Guaranty as an inducement; the ample solvency of the sponsor at that time gave that guaranty major importance.[2] (3) The principal mortgage deposited with the State Street Trust Company, the trustee of the series before us here, was the Guyon mortgage. It constituted 85% in value of the deposited securities in the Trust Fund. This Guyon mortgage was continuously in default, as to principal, beginning in May 1930. From that time on, the trustee was keenly aware of that default, as appears from many letters, calling attention to it, written by the trustee or its counsel to the debtor or the guarantor. (4) The so-called Secondary Guaranty provided that the guarantor would pay the principal of such a defaulted mortgage within eighteen months.[3] The eighteen months expired in November 1931. Since the guarantor was solvent then, and for several years thereafter, the bondholders (the beneficiaries of the trust) would have been paid in full, if the trustee had sued the guarantor with reasonable promptness. (5) But the trustee—which does not and could not possibly argue that it overlooked the default, and which has reported no reason for its conduct—deliberately, with "reckless indifference to the interest of the beneficiaries of the trust,"[4] chose to take no action against the guarantor until the guarantor's bankruptcy, some three years later, in 1935. (6) As a consequence, the bondholders suffered a huge loss. (7) There was no way by which any bondholder could have known, and no bondholder in fact did know, of the default on the Guyon mortgage, or of the resultant liability of the guarantor, until after the guarantor's bankruptcy in 1935. Accordingly, until then—when it was too late—none of the bondholders could possibly have demanded that the trustee sue the guarantor on the Secondary Guaranty.[5]

The trustee, nevertheless, denies liability. Its defense may be summarized thus:

"It is true that we alone could enforce the guaranty since, by its express terms, it ran only to us, as trustee, for the benefit of the bondholders. We maintain, however, that we were but custodians of this guaranty, with no obligation whatever to enforce it, although well aware of the happening of facts rendering the guarantor liable, because we had merely a power to sue the guarantor if we happened to feel like it, unless we were requested so to act by bondholders. Practically, of course, this idea of a request from bondholders made no sense, for the bondholders could have no information of the guarantor's default unless we, with knowledge of it, happened to feel like advising them of it. But we did not happen to feel that way. Simply by not telling them of a fact which we knew but which we knew they did not know, and in that way arranging that they could not ask us to act, we were able, without liability, to engage in what would otherwise have been a complete disregard of our duty as trustee.[6] We had no duty to inform the bondholders. Why? Because, although we were boldly named in the bonds and the indenture as 'Trustee,' we assert that a careful reading of the indenture reveals that we had been thus immunized from liability for not acting as a trustee with respect to this guaranty. For, although no clause ex-

---

**2.** See, infra, Point II, 2, for further discussion.

**3.** This guaranty provides that "The Guarantor hereby agrees to guarantee and does hereby unconditionally guarantee the payment of interest accruing on all said securities now or at any future time deposited in the Trust Fund, under and pursuant to Article I, Section I, paragraph (a), (b) and (c) of said Trust Agreement, when due and payable, and also guarantees the payment of the prin-

cipal thereof within eighteen months after the same shall have become due according to their respective terms."

**4.** See, infra, for discussion of the Restatement of Trusts.

**5.** The bondholders would learn promptly of a default on the so-called Primary Guaranty, i. e., to pay the debtor's bonds themselves when in default. But no such default occurred until 1935.

**6.** See discussion, Point II, 5, infra.

pressly so states, we contend it is clear that, piecing together several of the clauses and relying on implication, our inaction on this guaranty gave rise to no liability on our part."[7]

My colleagues sustain this defense. In arriving at their decision, they use much ingenuity in interpreting ambiguous provisions of the indenture, with (I think) marked generosity to the trustee—which (unlike the bondholders) had studied and agreed to those provisions before any bonds were issued and sold. My colleagues say that "the trustee meant to obtain a general immunity from any liability for non-feasance." Had that been the intention, the matter would not have been left to implication, but the indenture would have provided, as many trust indentures do, that the trustee should not be liable "except for its own wilful default" or the like.[8]

Even if it had, the trustee here would have been liable, I think. For it is well settled that even such a clause cannot exempt a trustee from liability for inaction which amounts to "reckless indifference to the interest of the beneficiaries." Thus the Restatement of Trusts (cited by my colleagues) says, in Section 177, "The trustee is under a duty to the beneficiary to take reasonable steps to realize on claims which he holds in trust," and, in Section 222(2), "A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed * * * with reckless indifference to the interest of the beneficiary. * *" Comment a to Section 272 states that exculpating provisions "are strictly con-

strued, and the trustee is relieved of liability only to the extent to which it is clearly provided that he shall be excused"; and Comment b says that it is "contrary to public policy to give effect to" a provision purporting to exculpate a trustee from "breaches of trust committed with reckless indifference." Scott, Trusts (1939) is in accord; see Sections 222.2 and 222.3. The Massachusetts court, whose decisions are applicable to the liability of the trustee under this Massachusetts instrument, recently cited with approval the statements of Scott and The Restatement,[9] indicating their peculiar relevance to the duties of a trust company acting as a trustee.[10]

Here, absent any explanation, surely the trustee's deliberate neglect to sue the guarantor adds up to "reckless indifference." Yet although the express wording of the exculpatory clauses here is much narrower than "wilful default," my colleagues, solely by implication, construe those narrower clauses as intended to accord the trustee a wider immunity which, without saying why, my colleagues hold valid. They confer absolution on this trustee by reading into the exculpatory clause on which they principally rely an implied reference to the Secondary Guaranty. Their reasoning relates to the following: Throughout the indenture (literally more than a hundred times) there are references to the "Trust Fund"; in each instance the initial letters of those words are thus capitalized. In the opening recitals of the indenture, it is said that a "Trust Fund" has been established "as provided in Article I

7. My use of quotation marks does not mean that I am literally quoting the trustee. I am paraphrasing its arguments.

8. See, e. g., New England Trust Co. v. Paine, 317 Mass. 542, 548–551, 59 N.E.2d 263, 158 A.L.R. 262; Milbank v. J. C. Littlefield, Inc., 310 Mass. 55, 62, 36 N.E.2d 833; Peterson v. Hopson, 306 Mass. 597, 608–610, 29 N.E.2d 140, 132 A.L.R. 1; Digney v. Blanchard, 226 Mass. 335, 337, 115 N.E. 424; Warren v. Pazolt, 203 Mass. 328, 347, 89 N.E.2d 381.

9. See New England Trust Co. v. Paine, 317 Mass. 542, 550, 551, 59 N.E.2d 263, 158 A.L.R. 262.

See also Posner, Liability of the Trustee under the Corporate Indenture, 42 Harv.L.Rev. (1928) 198, 244–245; 37 Col.L.Rev. (1937) 130, 131–132.

10. See 20 Minn.L.Rev. (1935) 210, 215: "Where the trustee is a corporation that holds itself out as peculiarly well qualified to assume the duties of the trust relationship, it will probably be held to a higher standard of care than would be required of an individual." See also Shinn, Exoneration Clauses in Trust Instruments, 42 Yale L.J. (1933) 359, 374–376.

hereof." Article I bears the caption, "Concerning the Trust Fund." And Section 1 of Article I, captioned "Contents of Trust Fund," sets forth with precision the several kinds of securities, to be delivered to the trustee, of which "said Trust Fund shall consist." Section 2 of Article I mentions specifically the instruments which must accompany the securities described in Section I; included in those instruments are fire insurance and title policies. Significantly, the Secondary Guaranty is not mentioned anywhere in Section 1 or Section 2. Nevertheless, my colleagues concededly base their decision on the proposition that the promise of that Guaranty was part of the Trust Fund "in precisely the same sense" as were the "promises in the policies of fire and title insurance, mentioned in Article I, Section 2"—although this court held the exact opposite in an earlier Prudence-Bond decision, President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 478.[11]

## I

I shall, however, postpone (and kennel in Point II of this opinion) my detailed criticisms of my colleagues' interpretations of the several clauses of the indenture, because I think that, even if those detailed criticisms are unfounded, my colleagues' ultimate conclusion cannot stand up. For, when they get all through their discussion of particular clauses, my colleagues candidly acknowledge (1) that the instrument contains no plain words, or blanket provision, relieving the trustee of liability for not enforcing this guaranty and (2) that any provision exculpating a trustee must be "strictly construed." I believe, then, that it will suffice to justify this dissent if I can expose (as I think I

can) grave faults in my colleagues' avowed method of "strictly" construing such a provision.

They maintain (a) that the correct method of interpreting a contract is the same as that used in interpreting a statute, and (b) that, therefore, in construing this trust agreement, the intent of the parties—whose words admittedly did not explicitly exculpate the trustee from liability as to the Secondary Guaranty—must be learned not by ascertaining what the parties actually intended but by answering the question as to how they would have dealt with this problem, which they never did consider, if they had thought of it when drafting the agreement. To these assertions I reply thus:

One may doubt—indeed many have doubted—whether all the guides to the interpretation of statutes serve adequately as aids to the interpretation of contracts.[12] The doubt stems from the obvious difference between the intention of a legislature and the intention of parties to an agreement: The legislature is composed of many persons; seldom do all of them know or understand the words of a bill which becomes a statute; such knowledge often is confined to some members of a committee.[13] Wigmore expressed scepticism concerning "the conventional assumption that there is a legislative will at all."[14] A Senator once said of a tax measure that "even Senators who have worked upon the bill for months do not understand it," and another Senator remarked that "there are many sections of the bill which it is almost humanly impossible for a man who is not an expert to understand or comprehend."[15] Powell has interestingly differentiated "private" writings (such as con-

---

11. This case will be discussed in Point II, infra.

12. See, e. g., Silving, A Plea For a Law of Interpretation, 98 U. of Pa.L.Rev. (1950) 499, 505.
   This is true despite the fact that a contract is sometimes considered a sort of "private statute" made by the parties and binding them, as to which see, e. g., Lawson, The Rational Strength of English Law (1951) 56–57; The French Civil Code, Art. 1134.

13. See, e. g., Wigmore, The Judicial Function, Editorial Preface to Science of Legal Method (1921) xxxiii et seq.; cf. S. E. C. v. Robert Collier & Co., 2 Cir., 76 F. 2d 939, 941.

14. Wigmore, loc. cit.

15. Eisenstein, Some Iconoclastic Reflections on Tax Administration, 58 Harv.L. Rev. (1945) 477, 519, note 240.

tracts, deeds and wills) and "public" writings (such as statutes, constitutions and treaties). All of the "public" genus "are alike in that commonly they are formulated by a group other than the group whose acts make them binding." They "are not couched in words which were chosen by those whose assent gives them validity, but are in language selected by other persons whose guiding purposes are often wholly unknown and unapproved by those whose assent makes them binding."[16] On that account, even the most liberal of those judges who rely on "legislative history" rather severely restrict the background the courts may explore to get at the legislative "intent." As, however, the persons who prepare and sign a contract are (unlike the members of the legislature) definitely ascertainable, it is easier to determine their intent. The courts therefore usually accord themselves a wide latitude in pursuing what may be dubbed the "contractual history."[17]

Consequently, although the ancient (Aristotelian) precept—"Consider how the legislature would have legislated if the legislators had thought of the subject"[18]—has often been applied in construing statutes by courts in this country and elsewhere,[19] this precept cannot be employed safely, I think, in construing a contract—when one seeks to discover what the parties really intended. With reference to contracts, such a precept has come to be recognized as nothing but a fiction used to sugar-coat the fact that the court, entirely without regard to the parties' intention, is imposing on them (or one of them) an obligation based on considerations of public policy, *i. e.,* the court's notion of justice, of decent, socially desirable conduct. True, at one time, under the spell of the notion that nothing but the will of the parties could determine their rights and duties, the courts, when thus importing into a contract a pretended provision not there found, did so on the alleged ground

16. Powell, Construction of Written Instruments, 14 Ind.L.J. (1939) 199, 204–206.

Powell refers to a New York statute, dealing with "cross-remainders," which he drafted, and tells this story: "While the bill was pending an inquiring member of the committee to which the bill had been referred met another legislator who was a lawyer and said: 'Tom, what's this bill about cross-remainders?' The answer came back: 'Jack, I wouldn't know a cross-remainder if I met one on the street!' The bill was passed despite this legislative unawareness of its import. Every volume of the Session Laws of this or any other state bears eloquent and frequent witness to like acts of faith."

Powell does remark (pp. 208–9) that a "private" writing is often drafted by a lawyer serving as a ghost-writer. But such ghost-writers have usually consulted with, and have tried to carry out the purposes of, the persons who sign those "private" writings.

We should not succumb to the temptation to work out a monistic theory of interpretation. (1) The several kinds of "private" writings should not be similarly interpreted: There are good reasons for dealing somewhat differently with wills and contracts; and constitutions call for treatment not entirely like that applied to statutes. (2) Nor should courts construe earlier judicial opinions just as they do statutes; see, e. g., Burrows, Interpretation of Documents (1943) 36 note 1; Lawson, The Rational Strength of English Law (1951) 16–17. In one important respect, the difference is obvious: a statute is not abrogated by disuse, but a precedent does become obsolete. See Eder, Comparative Survey of Anglo-American and Latin-American Law (1950) 21–22; cf. Gray, Nature and Sources of Law (2d ed 1921) 193–196; Allen, Law in the Making (5th ed. 1951) 454–457; Lenhoff, Comments, etc., on Legislation (1949) 849 et seq.

17. See, e. g., 3 Corbin, Contracts (1951) §§ 536, 537, 543, 549, 555; Powell, loc. cit., 231–233.

18. Aristotle, Nicomachean Ethics, Bk. V, Ch. 10, 1137b, quoted in Usatorre v. Victoria, 2 Cir., 172 F.2d 434, 439, note 12.

19. See, e. g., Usatorre v. Victoria, 172 F.2d 434, notes 12 to 16; Tobin v. Edwards, Wagner Co. Inc., 2 Cir., 187 F.2d 977; Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 615 et seq., 155 A.L.R. 761; N. L. R. B. v. National Maritime Union, 2 Cir., 175 F.2d 686, 690; cf. State Tax Commission v. Aldrich, 316 U.S. 174, 202, note 23, 62 S.Ct. 1008, 86 L.Ed. 1358; Cardozo, The Nature of The Judicial Process (1921) 140.

that so the parties would have said if they had thought of it. But of recent years, many courts (including this court) and the leading commentators have spurned that idea.[20] They have insisted that, in reality, the court in such circumstances inserts in the contract "what the court thinks the parties ought to have agreed, on the basis of what is fair and reasonable, not what as individuals they might have agreed," because what they would have said is but guesswork;[21] the judicially inserted provision is now acknowledged to have been "invented by the court" · because "justice demands."[22] So we have declared several times.[23] So Williston [24] and Corbin have stated.[25] I repeat that the fictitious "intention" in such cases derives from judicial notions of policy, of fairness, of justice. It is, writes Williston, "better to drop any talk about the intention of the parties where they express none, and rest [such doctrines] on their fairness—a quite sufficient basis."[26]

It follows, I think, that (as pretty plainly appears from the last part of their opinion) my colleagues base their decision not on what the parties really meant by their words but on what my colleagues, as a matter of policy, regard as a fair, just, or socially desirable result. With that result—that policy—I do not agree. I cannot believe that, disregarding the actual intent of the parties, we foster decent, socially desirable, conduct when we hold (as my colleagues do) the following:

(1) The trustee, by not bringing a timely suit on the guaranty, has cost the beneficiaries of the trust, the bondholders, at least some $400,000.

(2) Nevertheless, the trustee is not liable for this loss. Why? Solely because (so my colleagues say) no bondholder-beneficiary notified the trustee of the guarantor's default—despite the undeniable and undenied fact that no bondholder knew or could have known of it, and the trustee, well aware of it, did not advise the bondholders of the default.

To my mind, such a decision is most regrettable. It debases the noble word "trustee," allows it to become a tricky decoy to catch and injure innocent investors. "There's no equity stirring," [27] I think, in such a judicial policy. In another Prudence-Bonds case, involving an identically-worded trust indenture, we replied to the trustee's asserted interpretation of a different provision of the instrument, that so to construe it "would be to impute to the Corporation [the debtor] and the Bank [the trustee] an intention which verges on dishonesty, and it is therefore an interpretation not to be adopted unless (as is not the case here) no other is possible."[28] Much the same can and should be said in

20. The cases cited by my colleagues, with one exception, do not voice the old fiction. The one exception, Rudy-Patrick Seed Co. v. Kokusai, etc., Kaisha, 2 Cir., 85 F.2d 17, 20, contains a dictum which is directly contrary to statements in this court's subsequent opinions cited in note 19, infra.

21. Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour, Ltd., [1943] A. C. 32, 70, 71.

22. Denny, Mott & Dickson, Ltd. v. James B. Fraser & Co. Ltd., [1944] A.C. 265, 275.

23. Parev Products Co. v. I. Rokeach & Sons, 2 Cir., 124 F.2d 147; United States v. Forness, 2 Cir., 125 F.2d 928, note 25; Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978, 990–991; Beidler & Bookmyer v. Universal Insurance Co., 2 Cir., 134 F.2d 828, 829–830; Guttmann v. Illinois Central R. Co.,

2 Cir., 189 F.2d 927, 929, 27 A.L.R.2d 1066; cf. Martin v. Campanaro, 2 Cir., 156 F.2d 126, 130 note 5; Sperbeck v. A. L. Burbank & Co., Inc., 2 Cir., 190 F.2d 449, 451.

24. Williston, Contracts (Rev.ed. 1932) §§ 806, 825, 896, cf. 615.

25. See, e. g., Corbin, Contracts (1951) §§ 550, 561, 565, 622, 632, 653, 654, 1331.

26. Thus "many so-called contractual obligations may be viewed as to some extent quasi-contractual"; Sperbeck v. Burbank & Co., Inc., 2 Cir., 190 F.2d 449, 451; Martin v. Campanaro, 2 Cir., 156 F.2d 126, 127, 130.

27. Shakespeare, I Henry IV, Act II, scene 2. See Phelps, Falstaff and Equity (1901) 10ff. Cf. Isaiah 59:14.

28. President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465 at page 470.

the instant case. To call a prostitute a virgin would, I think, be no more strange than to permit the trust company here successfully to avoid one of its major fiduciary obligations and yet call itself a "trustee."

## II

The foregoing, if correct, will alone suffice to refute my colleagues' arguments. In addition, I think their reasoning as to specific exculpatory provisions is unsound.

1. They say (as noted above) that their decision depends and must depend, on this proposition: The indenture, by necessary implication, made the so-called Secondary Guaranty a part of the "Trust Fund" described in Article I. With this proposition I disagree for these reasons:

Article I is entitled "Concerning The Trust Fund." Section 1 of this Article states that the "Trust Fund shall consist of the following," and then goes on to refer specifically to (a) bonds and mortgages made by corporations other than the debtor or the guarantor; (b) bonds, notes or other evidences similarly made, other than those described in (a) and of a stated character; (c) bonds of the debtor and shares of bonds and mortgages; (d) bonds and other securities legal for investment by banks; (e) cash (or the equivalent). Section 2 of Article I calls for instruments which must accompany "bonds and mortgages delivered to the Trustee" under Section 1—viz., fire insurance and title guaranty policies.

There is not a syllable in Article I—the sole Article purporting to describe the Trust Fund—which—although it specifically refers to the fire and title insurance policies—in any way refers to the so-called "Secondary Guaranty." That Guaranty is described in, and required by, a distinct Article, i. e., Article III, Sec. 1(f).[29] The fact that this Guaranty is not described in Article I—which quite carefully enumer-

ates the contents of the Trust Fund, including, in Section 2 the fire and title policies—would seem clearly to defeat the argument that that Guaranty was meant to be included in Article I: If such was the parties' purpose, it would have been so easy to say so explicitly. Nevertheless, my colleagues include that Guaranty in Article I by mere implication—and, remarkably, as a part of their purported "strict" interpretation.

My colleagues obviously feel called upon to explain why, if that Guaranty was intended to be part of the Trust Fund, it was not explicitly named in Article I. This they do thus: They say that the Secondary Guaranty was not executed until "more than a year after the Indenture" and that "the fact that it was not in existence at the time may well account for the failure to recite it as part of the mortgaged property in Sections 1 and 2, Article I." Surely that attempted explanation won't wash, since there was nothing whatever to prevent the guarantor, the sponsor of the trust, from executing this Guaranty and delivering it to the Trustee on the very day the indenture and the Primary Guaranty were executed.

Moreover, as above noted, this court—in a case not mentioned by my colleagues—has already decided this issue. President & Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 478, related to the liability of a trustee under an indenture, securing another Prudence-Bonds "series," worded precisely as is the indenture here. There the trustee, before authenticating the debtors' bonds, had not obtained what we have here called the Secondary Guaranty. Rejecting a suggestion that this failure made the trustee liable, we said (147 F.2d at page 478): "Appellees also suggest that the Bank [the trustee] improperly authenticated the Corporation's [debtor's] bonds because, before authentication, there was not in its possession the guarantee of

29. Section 1 of that Article—entitled "Covenants of the Corporation" (the debtor)—provides that the debtor "covenants and agrees * * * (f) that it will deposit with the Trustee a guaranty of the Prudence Co., Inc., guaranteeing payment of interest semi-annually when

due, and of principal within eighteen months after the same becomes due, according to the terms of each bond, mortgage and other security in the Trust Fund under paragraphs (a), (b) and (c), Section 1 hereof."

(a), (b), and (c) collateral in the trust fund. But neither Article I, § 1, which describes the required contents of the trust fund, nor the associated Article I, § 2, which describes the instruments which must accompany mortgage collateral, refers to that guarantee."

As, then, there exists no foundation for their reasoning, I see no warrant for my colleagues' assertions (1) that, within Section 5 of Article I—the very Article which, in its sections 1 and 2, specifically enumerates the contents of the "Trust Fund" but does not include in that enumeration the Secondary Guaranty—this Guaranty is an agreement "contained" in some of the "securities constituting the trust fund" fully as much as a "fire, or title, insurance policy," and (2) that a breach of the guaranty was a "default * * * hereunder," within Article V, Section 1. For, according to my colleagues' opinion, both those assertions are necessarily grounded on the untenable proposition that this Guaranty was part of the Trust Fund.

2. My colleagues say, however, that they cannot understand why there should be any distinction between the "Trust Fund" and the "trust res." I experience no difficulty in seeing such a distinction, especially as the instrument itself observes it, as when, in the sixth paragraph of Article V, Section 1, it speaks of "the trust estate," whereas elsewhere there are repeated references to the "Trust Fund." I think the parties labelled a portion of the trust estate (or trust res or trust assets) by a distinctive term—i. e., the Trust Fund—for the purpose of restricting the liability of the trustee with respect to such assets, while not thus relieving the trustee as to the particular asset, the Secondary Guaranty, not included in that part of the trust estate labelled the "Trust Fund." [30]

My colleagues argue that the parties could not have intended such a differentiation, as it would have the result (1) of exculpating the trustee for failure to foreclose the mortgages deposited with it, and specifically described as constituting part of the Trust Fund, but (2) of leaving the trustee liable for not enforcing the Secondary Guaranty. This result my colleagues deem irrational. But I think they have overlooked this fact: From the evidence in this case and other Prudence Bonds cases decided by us, it is easily inferable that the several trustees were grossly negligent in discharging their duties because they considered the guarantor—the sponsor of all these trusts—so amply solvent that any losses on deposited mortgages were unimportant. (A fact noted above lends strong support to this inference, i. e., that the sponsor declared, in the Secondary Guaranty itself, that it was using that Guaranty to induce investors to purchase the bonds. If, however, there were doubt about this inference, we should, I think, remand to give appellants an opportunity to offer evidence on that score.) Presumably, then, the most important asset securing the bonds was the

**30.** Of course, an unsecured claim against a third person can be a trust res or trust asset, its enforcement being a duty of the trustee. See Brooklyn Trust Company v. Kelby, 2 Cir., 134 F.2d 105, 116; York v. Guaranty Trust Company of New York, 2 Cir., 143 F.2d 503, 512.

As this court has said, the use of the Latin word "res," instead of the English word "thing," sometimes leads to confusion. See Brooklyn Trust Company v. Kelby, 2 Cir., 134 F.2d 105, 116.

My colleagues speak confusingly (to me) when they say that they need not consider whether "the Primary Guaranty was a part of the res," since "it was a promise to the bondholders to pay the Debtor's obligations, and had nothing to do with the res."

In President & Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 478, in passing on the jurisdiction of the court over a claim against the trustee for failing to enforce the debtor's covenant to deposit what we here call the Secondary Guaranty, we said that that claim was not one "for restoration of the fund" within the peculiar New York decisions as to who may sue where a technical "restoration-of-the-fund" is not involved. That jurisdictional decision, under that unique New York doctrine, is not pertinent here on the substantive issue whether the Secondary Guaranty was part of the "trust estate" administered by the trustee.

potential liability of the guarantor on the Secondary Guaranty. Here it should be noted that a default in payment of the principal of a deposited mortgage might take place—as here it did—without the knowledge of the bondholders and long before a default in payment of the debtor's own bonds; that is precisely why prompt enforcement of the Secondary Guaranty had great value to the bondholders—and why, explicably, the exculpatory clauses did not excuse the failure to sue in that Guaranty.

3. Section 7 of Article I provides that the debtor "shall have the right," with the consent of the guarantor, "to alter, or modify the terms of any bond, mortgage, or other security or instrument, constituting a part of the Trust Fund" (provided an officer of the debtor certifies that the value of the remaining security is adequate to secure the outstanding debt). My colleagues' basic premise (*i. e.,* that the Secondary Guaranty is a security included in the Trust Fund described in Article I) leads to the unreasonable conclusion that that Guaranty could thus have been altered or modified by the guarantor and its affiliate, the debtor.

4. That my colleagues are compelled to strain the indenture's language to reach their conclusion shows up in their discussion of the first sentence of Section 1 of Article V which, for convenience, I quote in the footnote.[31] As this long-winded sentence is divided into two parts, separated by a semicolon, I think it will help to print it as follows, with no change in wording or punctuation,[32] so as to bring out its logical structure:

"The Trustee and its successor or successors in the trust hereby created accept the trust herein created upon the distinct understanding and agreement that

(A) the Trustee shall be under no obligation to *take any action*

to enforce any of the provisions contained in any of the securities deposited in the Trust Fund

or

*toward* the execution or *enforcement of the trust* hereby created

which, in its opinion, shall be likely to involve it in expense or liability,

*unless* the Corporation or one or more of the holders of Prudence-Bonds issued hereunder shall, *as often as required by the Trustee, furnish indemnity* satisfactory to the Trustee against such expense or liability;

(B) nor shall the Trustee be required to take notice of

*any default or 'event of default'* hereunder, and it may, for all purposes,

conclusively assume that there has been

*no default or 'event of default'* hereunder, unless and until

31. "The Trustee and its successor or successors in the trust hereby created accept the trust herein created upon the distinct understanding and agreement that the Trustee shall be under no obligation to take any action to enforce any of the provisions contained in any of the securities deposited in the Trust Fund or toward the execution or enforcement of the trust hereby created which, in its opinion, shall be likely to involve it in expense or liability, unless the Corporation or one or more of the holders of Prudence-Bonds issued hereunder shall, as often as required by the Trustee, furnish indemnity satisfactory to the Trustee against such expense or liability: nor shall the Trustee be required to take notice of any default or 'event of default' hereunder, and it may, for all purposes,

conclusively assume that there has been no default or 'event of default' hereunder, unless and until notified in writing thereof by the holders of at least twenty-five per centum in principal amount of the Prudence-Bonds issued hereunder and then outstanding, distinctly specifying such default, nor shall the Trustee take any action in respect to any default or 'event of default' unless requested to take action in respect thereto by a writing signed by the holders of not less than twenty-five per centum in principal amount of the Prudence-Bonds issued hereunder and then outstanding, and upon being tendered indemnity as hereinbefore provided."

32. I have italicized some words, and added the symbols (A) and (B) to indicate the two parts of the sentence.

*notified in writing thereof* by the holders of at least twenty-five percentum in principal amount of the Prudence-Bonds issued hereunder and then outstanding, *distinctly specifying such default,*

nor shall the Trustee take any action in respect to

any *default or 'event of default'* unless

*requested* to take action in respect thereto by *a writing* signed by the holders of not less than twenty-five percentum in principal amount of the Prudence-Bonds issued hereunder and then otustanding,

and

upon being tendered *indemnity* as hereinbefore provided."

The second part of this sentence—beginning with the symbol (B)—deals exclusively with "a default or 'event of default.' " The first part covers much more; it includes "enforcement of the trust hereby created." To the extent, then, that "enforcement of the trust" goes beyond action as to a "default" or "event of default," it plainly is not covered by the second part. The second part, however, provides that the trustee is excused from taking action on a "default" or "event of default" unless both (a) indemnified on its demand for indemnity, and (b) requested by bondholders to take action; but in the first part, as to "enforcement of the trust," the trustee is excused only if not indemnified when it demands indemnity. If, then, the failure of the guarantor to comply with the Secondary Guaranty was not a "default" or "event of default," the trustee had no excuse for not suing the guarantor, since the trustee never asked for indemnity. My colleagues concede that the guarantor's failure so to comply was not an "event of default." But they treat it as a "default." This they do by equating the trustee's action on a "default" with "enforcement of the trust." Only by thus curiously merging the first and second part of this sentence, which the draftsmen carefully kept asunder, are they able to excuse the trustee

for non-action here on the ground that no bondholders requested a suit against the guarantor.

5. In support of their interpretation, my colleagues refer to Article III, Section 1(i), which provides that the debtor shall furnish the trustee with monthly written statements showing the amount of principal—not interest—collected on each mortgage in the Trust Fund. It also provides, "The Trustee shall be under no duty to take action upon any such statement or see to the receipt thereof by it." Now this provision —not mentioned in the briefs filed by the trustee—must be matched with the Secondary Guaranty which covers two separate items: The Guarantor guarantees

(a) payment, *when due, of the interest* on all securities in the trust fund;

(b) payment of the *principal* of those securities not when due (as in the case of interest) but *eighteen months after due date.*

Wherefore, if my colleagues correctly interpret Article III, Section 1(i), then, curiously, it absolves the Trustee of any duty to enforce the guaranty as to principal but not as to interest, *i. e.,* the trustee would be liable, because of non-enforcement of the Guaranty, to make good defaulted interest on, but not a default as to principal, of a deposited mortgage. The queerness of this result, I think, goes to show that that interpretation is untenable. It is, I think, more reasonable to construe the words "The Trustee shall be under no duty, etc." (a) as not requiring the trustee to take action to bring about payment by the Guarantor of the principal of a deposited mortgage when it fell due, but (b) as not relieving the trustee of the duty (1) to take action against the guarantor as to interest on such a mortgage when due, and (2) to take such action eighteen months after principal on such a mortgage came due.

But let us assume, *arguendo,* that this sentence did absolve the trustee of the duty to ascertain whether a pledged mortgage defaulted as to principal and remained in default for eighteen months. On that basis, without such knowledge, the trustee was not obligated to sue the guarantor for non-payment of such principal. I submit

that, even so, this sentence did not relieve the trustee of its duty to enforce the guaranty when, as here, it actually knew that a deposited mortgage was in default for eighteen months. It was said in 1928: "If a situation arises which to the knowledge of the trustee directly imperils the integrity of the trust estate, it is fair to assume that a duty of protection would be implied regardless of express covenants or clauses relieving the trustee of liability for inaction. Certain events by their very nature do not become known to bondholders, and this fact, as well as the character of the event, must be taken into consideration in determining whether a situation is of such consequence as to demand action on the part of the trustee." [33] The same article, referring to a provision that the trustee, even when apprised of a default, is not obligated to take action unless requested by bondholders, also says that, if the trustee "has actual knowledge of a default going directly to the integrity of the security, whether because it has been informed by the bondholders or otherwise, the trustee would be ill-advised if it failed to exercise at least ordinary care in protecting the *res*. This would be particularly true if the nature of the default is such that the bondholders may be unaware of its existence." [34] The same author, writing in 1937,[35] described such a provision as the "ostrich" clause, and remarked, "It may be doubted" whether it "will protect the trustee in the presence of actual knowledge of default, where inaction results in loss to the bondholder." He further said: "Manifestly, notice from bondholders is impossible unless they know of the default, and the usual indenture provisions impose upon the trustee no duty to impart such knowledge. The absurd result reached is that the trustee is conclusively presumed not to know of a condition which in most situations it is the first to learn. It by no means follows, however, that the trustee in the absence of such a duty may safely remain quiescent; for the very necessity for notice and demand implies that at some point in the course of the transaction there will be imposed upon the trustee, as an inherent incident of its relationship, the implied duty to notify bondholders in order that they may act for their own protection if the trustee does not." [36]

I find it difficult to interpret the sentence in Article III, Section 1(i) as my colleagues do, since the result of their interpretation would be that the guaranty as to the deposited mortgages would have no practical value as security for the debtor's bondholders. For, as they would not—as they did not—learn of the non-performance of that guaranty until the guarantor failed to perform its "Primary Guaranty" (*i. e.,* to pay the bonds themselves), my colleagues' interpretation of this sentence would have the effect, practically, of converting into window-dressing, deceptive of the purchasers of bonds, the guaranty of payment of the deposited securities.

6. My colleagues' discussion of the exculpatory provisions reveals those provisions as being (to say the least) somewhat ambiguous. It is, then, pertinent that the bondholders had nothing to do with drafting the indenture but that it was prepared by the trustee, the debtor, and the guarantor, before any bonds were issued and sold to investors. Applicable here is the familiar rule (well stated in a case my colleagues cite) [37] that, when a contractual provision is ambiguous, it should be most strongly construed against the person who prepared it.[38]

Perhaps by way of an anticipatory replication my colleagues say that "indentures containing such [exculpatory] clauses have been uniform up to the present time," without judicial interference. I believe that

33. Posner, Liability of The Trustee Under the Corporate Indenture, 42 Harv.L.Rev. (1928) 198, 222.

34. Ibid., 245. See also 37 Col.L.Rev. (1937) 130, 131–132.

35. Posner, The Trustee and The Trust Indenture: A Further Study, 46 Yale L. J. 737, 783 (1937).

See also 36 Mich.L.Rev. (1938) 996, 999–1000; Seelig v. First National Bank, D.C., 20 F.Supp. 60, 68.

36. Ibid., 763.

37. Sternberg v. Drainage Dist. No. 17, 8 Cir., 44 F.2d 560, 580.

38. See, e. g., Corbin, 3 Contracts (1951) § 559.

statement unjustified: As above stated, many indentures contain a blanket exculpatory provision *(i. e.,* no liability except for "wilful default," or the like), and such a provision would not have protected the trustee here, since its conduct amounted to "reckless indifference." I have found no cases, other than our previous Prudence-Bond cases,[39] interpreting clauses worded as are those before us here. To construe those clauses liberally, in order to save the trustee harmless is, I think, without precedent. More, it is against the precedents.[40]

39. Including President & Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 478, discussed supra.

40. See the Restatement of Trusts, Scott, and the Massachusetts cases cited supra.