**CHEMICAL BANK & TRUST CO. v.
PRUDENCE–BONDS CORP.
(NEW CORP.) et al.**

**No. 246, Docket 22635.**

United States Court of Appeals
Second Circuit.

Argued May 15, 1953.

Decided Aug. 20, 1953.

Charles M. McCarty, New York City
(Geo. C. Wildermuth and Samuel Sil-
biger, Brooklyn, N. Y., and Nemerov &
Shapiro and Koenig & Bachner, New
York City, on the brief), for Prudence-
Bonds Corp. (New Corp.) and others,
objectors-appellants.

Lester Kissel, New York City (Shear-
man & Sterling & Wright, Philip A. Car-
roll, and Hans H. Angermueller, New
York City, on the brief), for Chemical
Bank & Trust Co., petitioner-appellee.

Before CHASE, CLARK and FRANK,
Circuit Judges.

CLARK, Circuit Judge.

These appeals arise from the last of the accountings submitted, in connection with the reorganization under former § 77B of the Bankruptcy Act, 11 U.S.C. § 207, of the debtor Prudence-Bonds Corporation, by various banks serving as trustees of the trust funds established to secure the debtor's eighteen series of Prudence-Bonds. Several of the earlier accountings have been the subject of decision by this court.[1] The final accounting now before us is by the Chemical Bank & Trust Co., as successor Trustee of the fund securing Prudence-Bonds Fifteenth Series.[2] The Bank submitted its account, together with a petition for judicial settlement thereof, in September, 1938. Timely objections were thereupon filed by a bondholder, George E. Eddy, and these were later supplemented and joined in by Prudence-Bonds Corporation (New Corporation), the reorganized debtor, as well as by its reorganization trustee and several additional bondholders. The district court referred these objections—three in number—to the Special Master who had served in a like capacity in the earlier accountings, directing him to take testimony and report on the facts and applicable law.

After hearing fourteen witnesses and examining numerous exhibits, the Master on May 9, 1952, filed a thorough and comprehensive report, including 468 findings of fact and 52 conclusions of law, partially sustaining the first and third objections and fully sustaining the second. In sum, the Master concluded that the Bank had improperly released collateral from the trust fund (mostly in the form of cash) to the extent of $1,071,404.18, and recommended surcharging it for that amount, plus interest.

Upon review of this report, the district court adopted most of the Master's findings; but on the basis of its modification of the others, the court dismissed the first objection in its entirety, partially sustained the second objection, and fully sustained the third, and consequently ordered the surcharge to be reduced to $159,216.66, plus interest. Both the Bank and the objectors appeal from the court's decree, the Bank contending that there should be no surcharge whatever, while the objectors assert that their objections should be sustained in full. In addition, the objectors make certain claims as to the allowance of interest, costs, and expenses which will be discussed below.

### The Trust Agreement

The rights and obligations of the debtor Corporation and the Prudence Company, Inc.—an affiliate of the debtor which guaranteed performance of the debtor's commitments—on the one hand and of the Trustee on the other are set forth in a trust agreement executed on October 1, 1928, by the Corporation and the predecessor Bank as Trustee. Since the disposition of these appeals turns largely on our interpretation of the release provisions of this agreement, the principal section dealing with that subject, Article I, § 6, is here set out in full:

"Section 6. *Substitution and Withdrawal of Securities, Etc.*—The Corporation at any time and from time to time provided it is not in default in the payment of interest or principal on any of the bonds issued hereunder may withdraw any bond, note, mortgage, trust deed or other security or certificate of deposit or cash from the Trust Fund, as follows:

1. Central Hanover Bank & Trust Co. v. President and Directors of Manhattan Co., 2 Cir., 105 F.2d 130; Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, certiorari denied 316 U.S. 697, 62 S.Ct. 1293, 86 L.Ed. 1766; Brooklyn Trust Co. v. Kelby, 2 Cir., 134 F.2d 105, certiorari denied 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717; President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.

2d 465, certiorari denied 324 U.S. 866, 65 S.Ct. 916, 89 L.Ed. 1422; Prudence-Bonds Corp. v. State Street Trust Co., 2 Cir., 202 F.2d 555.

2. The original trustee for this series was the United States Mortgage & Trust Co., which merged with the successor Trustee on June 29, 1929.

"(1) By substituting for the item or items withdrawn, any other security or other item enumerated in Section 1 of this Article, equal in amount or value as defined in Section 4 of this Article I, to the unpaid principal of the bonds, notes, mortgages, trust deeds or other securities or cash withdrawn.

"(2) By written application to the Trustee, for such withdrawal, at any time when the principal amount of the Trust Fund as defined in Section 4 of this Article I may exceed the par value of the Prudence-Bonds issued and outstanding hereunder, but only to the extent of such excess.

"In either such case, the Trustee shall deliver to the Corporation the bonds, notes, mortgages, trust deeds or other securities or cash, so withdrawn with any necessary assignments thereof, provided there shall remain in the Trust Fund after any such withdrawal, bonds, notes, mortgages, trust deeds, or other securities and/or cash in amount or value (as defined in Section 4 of this Article I) not less than the principal amount of Prudence-Bonds then issued and outstanding hereunder, provided, that if any securities deposited in the Trust Fund enumerated in paragraphs (a), (b) or (c) of Section 1 of this Article, shall be in default in the payment of principal for more than 60 days the Corporation shall be permitted to withdraw only such securities deposited under said paragraphs (a), (b) or (c) as shall be so in default, except that the Corporation may withdraw any of the items enumerated under paragraphs (a), (b) or (c) of Section 1 of this Article in connection with the redemption or final payment at maturity, of any such items upon substitution therefor of cash and/or securities enumerated in Section 1 of Article I. The Trustee may accept as conclusive the written statement of any officer of the Corporation as to whether or not any securities deposited in the Trust Fund are in default in the payment of principal or interest.

"Upon the delivery to the Trustee for cancellation of any or all of the Prudence-Bonds secured hereunder, with all unmatured coupons attached thereto, or cash equal to such coupons as are not delivered, or in lieu of such bonds and coupons or cash, a certificate by an officer of the Corporation approved by an officer of The Prudence Company, Inc. that certain of such bonds, with the coupons, if any, belonging thereto, matured at a date earlier than six years prior to the date of such certificate, and have not been presented for payment, the Corporation shall be entitled to withdraw from the Trust Fund, and the Trustee shall deliver to the Corporation, bonds, notes, mortgages, trust deeds or other securities, or cash, enumerated in Article I, equal in amount or value, as defined in Section 4 thereof, to the principal amount of Prudence-Bonds so delivered for cancellation, or represented by the certificate above mentioned."

Article I, § 4, referred to in the above section, provides:

"Section 4. *Amount and Computation of Trust Fund.*—The aggregate principal amount of the Trust Fund as herein created and determined shall at no time be less than the aggregate principal sum of Prudence-Bonds issued and outstanding.

"In determining and computing the aggregate principal amount of the Trust Fund at any time, there shall be included all securities deposited under paragraphs (a), (b) and (c), Section 1 of this Article, at their face principal amounts irrespective of whether any thereof are overdue or in default as to principal or interest (but less any payment shown to the Trustee to have been made on account of principal thereof), and there shall also be in-

cluded all bonds and other securities and cash deposited under paragraphs (*d*) and (*e*) thereof at their cash market values as of the date of deposit."

Section 1 of Article I contains five subsections specifying the various types of collateral authorized by the agreement for the contents of the trust fund. Of these, subsecs. (a) to (c) defined certain types of mortgage bonds, while (d) and (e) referred to more liquid securities such as government bonds and cash. In fact the instant fund contained only bonds and mortgages on improved real estate, covered by subsec. (a), and cash, authorized by subsec. (e). The references in the above-quoted provisions to the securities enumerated in subsecs. (a) to (e) thus apply only to these two types of collateral for purposes of the present appeals.

Certain additional provisions of the trust agreement which bear upon the issues of this case will be quoted or referred to later in this opinion when their context will become clear. We discuss in order first the appeal of the objectors from the dismissal in whole or part of their objections and the refusal to make a larger surcharge against the Trustee as recommended by the Special Master, and second the appeal by the Trustee-Bank from the court's action in sustaining the objections in part and in making certain surcharges.

### I. Objectors' Appeal

■ 1. *From Dismissal of the First Objection.* The first objection is addressed to the action of the Bank on December 26, 1930, in releasing from the trust fund the Butterick Publishing Company mortgage, on which the principal then due was $887,500, and surrendering it to the debtor in return for this sum in cash. The objectors contend that since other collateral in the fund, namely, the Hillman Hotel Company, Inc., mortgage, was in default of principal for more

than 60 days on the date of this transaction, the release of the Butterick mortgage while the defaulted security remained in the fund violated Article I, § 6, of the trust agreement. Pointing out that the Butterick mortgage was not due to mature until March 1, 1935, they assert that its release therefore did not fall within the third proviso of § 6 authorizing withdrawals "in connection with the redemption or final payment at maturity," even though other collateral may be in default of principal for more than 60 days. The Bank, on the other hand, takes the position that its action was permitted by the "redemption or final payment" clause, interpreting it to mean "redemption before maturity or final payment at maturity." Both the Master and the district judge agreed with the Bank's construction, and so do we. The word "redemption" is clearly used in the sense suggested by the Bank in the later Article II, § 6, of the agreement, the heading of which is "Redemption and Discharge Before Maturity." And only with this interpretation does "redemption" in the phrase at issue retain any meaning, since it would otherwise be a pointless and confusing redundancy.

■ In pressing this objection on appeal—and also below, according to their assertions—the objectors do not claim the full face of the mortgage, although, as they point out, its payment did provide available cash for some of the releases challenged in the second objection. So, as they say, the ultimate result was that the trust fund "lost not only the Butterick mortgage, but also all the cash received in substitution for it." The second objection therefore somewhat overlaps this, but can and will be disposed of separately below. What was actually claimed here, and allowed by the Master, was the sum of $22,187.50, a prepayment fee paid to the guarantor of the Butterick mortgagor for the privilege of early redemption, which the Bank failed to collect from the guarantor.[3] But we

---

3. Alternatively they claim a surcharge of the interest on the Butterick mortgage to its maturity date, less an adjustment of interest on the releases covered by the second objection for this same period and up to the same amount; at 6% interest, the result would be very nearly the same as the amount allowed by the Master.

think the judge was correct in rejecting the Master's surcharge of this amount against the Bank. The trust agreement required remittance to the Bank only of payments of principal on fund securities; collections of interest and all other charges could be retained by the debtor or guarantor. The premium here paid to the guarantor was merely consideration for its surrender of the right to receive future interest under the mortgage; it was in effect a reduced prepayment of interest. Our view is not in conflict with the apparent position of the New York courts holding such prepayment fees not to be interest for purposes of the usury statutes. Feldman v. Kings Highway Sav. Bank, 303 N.Y. 675, 102 N.E.2d 835; Lyons v. National Sav. Bank of City of Albany, 280 App.Div. 339, 113 N.Y.S.2d 695. These cases construe such fees as consideration for a new and separate agreement terminating the indebtedness. Since, as we have held, the debtor and guarantor were free to withdraw securities from the trust fund for redemption before maturity, we can see no bar to their entering into a collateral contract to compensate them for the loss in interest income which they will sustain by virtue of such redemption. And whether the payment thus received be deemed in the nature of interest or consideration on a separate contract, it is in any event not principal on the redeemed mortgage and was thus not payable to the Bank.

2. *From Dismissal of the Second Objection in Substantial Part.* The second objection challenges the propriety of the Bank's releasing from the trust fund as excess collateral a total of $1,045,250 in cash in twelve separate payments between October 31, 1930, and August 17, 1931, as follows:

| | |
|---|---:|
| October 31, 1930 | $ 12,500.00 |
| November 29 | 30,616.63 |
| December 22 | 2,333.33 |
| December 27 | 47,833.34 |
| February 26, 1931 | 416.70 |
| April 27 | 525,450.00 |
| June 8 | 42,300.00 |
| June 8 | 372,566.66 |
| June 17 | 3,475.00 |
| July 20 | 2,258.34 |
| July 27 | 1,408.32 |
| August 17 | 4,091.68 |
| | $1,045,250.00 |

Release of these amounts was claimed to be unauthorized by the trust agreement because collateral in the fund was in default of principal for more than 60 days. The fact that these payments were made is undisputed. And the district judge agreed with the Master that the Hillman Hotel Company, Inc., and Elmhurst-Hampton Holding Corporation mortgages were in such default during this period; the court held the former to be in default of principal for more than 60 days between October 1, 1930, and May 27, 1931, and the latter at all times here relevant after May 21, 1931. The Bank's challenge to the resulting conclusion that each of the enumerated releases was thus unauthorized will be considered below. Here, however, we are concerned with the court's holding reducing the full $1,045,250 surcharge ordered by the Master to $142,500 on the ground that there was "a clear day" from June 4 to June 8, 1931—during which period collateral in the fund not in default of principal for more than 60 days equalled or exceeded the principal amount of outstanding Prudence-Bonds—thus exonerating the Bank from liability for earlier unauthorized releases.

This "clear day" doctrine was originated in connection with earlier Prudence-Bonds trust fund accountings by the Special Master, whose report in the present case describes it as follows:

"In the other accountings in this proceeding, the doctrine of the 'last clear day' came into being and was applied. If, during the administration of the trust, all mortgages and other securities in the trust fund became in good standing, that is to say, were not in default in the payment of principal, and the aggregate principal amount of the bonds outstanding did not exceed the aggre-

gate principal amount of the trust fund, and the trust fund otherwise complied with the trust agreement, it was held that no ascertainable diminution of the trust fund resulted from prior withdrawals and substitutions of trust fund collateral, however unauthorized they may have been."

The broad question now presented is whether the aggregate principal amount of the trust fund between June 4 and 8 exceeded that of the outstanding Prudence-Bonds of this series. We had occasion to define what constituted such an excess under an essentially similar release clause in President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 470, certiorari denied 324 U.S. 866, 65 S.Ct. 916, 89 L.Ed. 1422. We there said: "In this context, the word 'excess' means the amount by which (a), (b) and (c) securities not in default, taken at their face value, plus cash and (d) and (e) securities, taken at their then market value, exceeds the principal amount of all then outstanding Corporation bonds."

Adopting and applying this definition, the Master found no clear day in June, 1931, or at any other relevant time. The principal amount of Fifteenth Series Prudence-Bonds outstanding on June 4 was $4,651,600. On the same day, the highest principal value of the trust fund (after deposit on that day of a $400,000 mortgage) was $5,093,900. Of this amount, however, the Elmhurst-Hampton mortgage was then in default of principal for more than 60 days; and the Master also properly found that two other mortgages, those of the Brooklyn Parking Terminal and Van Cortlandt Sporting Club, totalling $556,083.34 in principal amount, were in default for 60 days or less. Deducting all of the defaulted mortgages under the above definition of "excess," the Master concluded that the nondefaulted collateral in the trust fund on June 4 had a principal value of only $4,377,816.66—$273,783.34 less than the then amount of the outstanding bonds.

The judge disagreed with the Master's interpretation of the requisite excess under this trust agreement. Noting that the agreement in our earlier case did not contain the 60-day clause in the third proviso of Article I, § 6, of the present trust agreement, he held the definition of "excess" in that case inapplicable here. Instead, he ruled that excess for purposes of the clear-day doctrine was to be computed by taking into account all securities in the trust fund not in default for more than 60 days. By thus computing the principal amount of the fund, the judge found that it exceeded the principal of the outstanding bonds between June 4 and 8 by $282,300, and that there was therefore a clear day during this period. The surcharge which he actually allowed of $142,500 was based on the difference between this amount thus available for release and the amounts in fact released from June 8 to August 17. The question now before us is whether it was error for the judge to include securities in default for 60 days or less in his computation of the value of the trust fund.

We think it was. The situation seems to us to be controlled by both the ruling and the rationale of President and Directors of Manhattan Co. v. Kelby, supra, 2 Cir., 147 F.2d 465, involving the Fifth and Ninth Series Prudence-Bonds. The variance in the third proviso of the "release" clauses, there providing for withdrawal of the mortgage securities "in default in the payment of interest," and here for withdrawal of such securities "in default in the payment of principal for more than 60 days," was succinctly expressed by the Master as an allowance here to the collateral in default of "an incubation period of 60 days." But he added quite properly: "However, this incubation period did not change the formula for arriving at 'excess'; the defaulted collateral was no less excludable from the required residue, after the withdrawal, because the default was not then 60 days old." Nevertheless, Judge Inch overruled the Master on this point to hold that under the "release" clause

here "a 'defaulted' security is one 'in default in the payment of principal for more than 60 days' and a default for any lesser duration appears to me to be immaterial." This, we think, was error.

The rationale of the Kelby case is not based upon the isolated language of the release provisos, but is an interpretation of the entire provision in its purpose and intent construed as part of an entire contract. So the reasons for the interpretation stressed by Judge Frank in his opinion are based upon clauses and provisions found elsewhere in all the respective trust agreements. In fact, the first reason, 147 F.2d at page 470, stresses a provision also found in the agreement here: "Article I, § 2, provides that each bond and mortgage of type (a) delivered to the trustee as part of the trust fund must be accompanied by an affidavit of a corporation officer that it is not in default as to payment of principal or interest." His second reason is based on Article II, § 2, relating to the authentication and issuance of Corporation bonds, which provides that so long as the Corporation shall not have been in default for a period of eighteen months, it shall have the right to issue, and the Trustee must authenticate, Prudence-Bonds in any maturity, provided that there are proper securities in the trust fund to match those issued. This provision is substantially the same as the requirement of the second proviso of the release clause, Article I, § 6. It is true that the agreements there contained a condition not found here for the deposit of securities of matching maturities with those to be authenticated,[4] which served additionally to show the strictness of the requirement for good securities in the trust fund. But there is nothing here which suggests any modification in the requirement there found that the Corporation bonds could not be issued in amounts not matched by cash or (d) or (e) securities, plus the face amount of (a), (b), and (c) securities not in de-

fault. As Judge Frank says: "For to construe this provision to permit bonds to be authenticated and issued against (a), (b), or (c) securities which were in default would be to impute to the Corporation and the Bank an intention which verges on dishonesty, and it is therefore an interpretation not to be adopted unless (as is not the case here) no other is possible."

Judge Frank continues: "The Bank, however, contends that, when an installment of the principal of a mortgage is in default, the quantum of the default, for purposes of the release clause, must be limited to that installment. We cannot agree. We think that, as the Master held, the clear intention was that, for this purpose, if one installment went unpaid when due, the entire amount of the principal of that mortgage should be regarded as in default."

He then takes up the argument of the Trustee-Bank based on the provisions of § 4 of Article I (see quotation above) for the computing of the (a), (b), and (c) securities at their face principal amounts, "irrespective of whether any thereof are overdue or in default as to principal or interest." He says, 147 F.2d at page 471: "But were this true, the release clause would in all circumstances permit the substitution of mortgages in default for undefaulted mortgages or cash. Such an interpretation would lead to so unreasonable a result that it should not be adopted if avoidable. It is avoidable: (1) The reference in the release to Article I, § 4, was, we think, intended merely to say that (a), (b) and (c) securities should be taken at their face amount, and (d) and (e) securities at their market value. (2) That reference in the release clause to Article I, § 4, is preceded by a reference to securities 'authorized by Section 1 of this Article,' and obviously that section called for the deposit of securities not in default. (3) That portion of the second sentence of Article I, Section 4, which states that (a), (b) and

---

4. *I.e.*, "maturing during the six months' period immediately preceding or the three months' period immediately following and including the maturity day of the Prudence-Bonds then requested to be authenticated."

76

(c) securities are to be taken at their face amount regardless of whether or not they are in default is to be read in association with the first sentence, and also with the provision of Article II, Section 1 (which provides that the aggregate principal amount of the Corporation's bonds at any time outstanding shall not exceed the principal amount of the trust fund and shall not exceed $5,000,000); therefore we think that that portion of the second sentence of Article I, Section 4, was meant, first, to protect the Corporation against demands for additional collateral, if (a), (b) or (c) collateral were in default or (d) and (e) securities declined in market value; and second, to define the rights of the Corporation to make collections under Article I, § 5."

Judge Frank goes on to consider other details of the trust; but enough has been said here to show that the conditions of interpretation in the two cases are essentially the same. As he says, 147 F.2d at page 472, "the release clause, as we have construed it, expresses the agreement's dominant purpose in the light of which its other provisions to which the Bank refers must be interpreted," that dominent purpose being "that the trust fund was equally to secure all the bonds." This construction makes the entire agreement consistent and avoids "an intention which verges on dishonesty." It accords to the 60-day default provision the intent to assure speedy elimination of stale defaulted securities, rather than to increase the assets subject to withdrawal. And it avoids the anomaly of the district court's view, which requires the writing into this negative restriction of an affirmative grant neither stated nor implied. The anomaly of such agreement-making appears the greater when we recall that there is no provision for a "clear day" in the trust itself; the principle is developed only as one of guidance to a court of equity in doing equity between the parties. As a creature of equity it is not naturally to be expanded sharply by remote implications deduced from an agreement touching other matters entirely.

Since this seems to us a reasonable construction of the trust along lines already established by this court we need not examine in detail other claims made by objectors to show that there occurred no "clear day," but only the recurring dark and cloudy ones. We should notice, however, their contention that the releases of cash in question did directly violate the third proviso of the release clause. It is pointed out several times in the Kelby case, supra, 147 F.2d at pages 469, 470, 473, that all three conditions of the release clause must be fulfilled before the Bank was justified in making the releases. This proviso is explicit in saying that "if *any* securities" so deposited in the trust fund are in default in the payment of principal for more than 60 days "the Corporation shall be permitted to withdraw *only* such securities * * * as shall be so in default." The words we have italicized seem to make the requirement beyond dispute. Since there were such securities in default—first the Hillman Hotel mortgage and then the Elmhurst-Hampton mortgage, as discussed in the first point of the Trustee's appeal below—the particular security in default alone could be eliminated at the time each of the releases in question was made.

The trial judge has objected to this as a barren formula determining simply the order of withdrawal; thus he says that if the Elmhurst-Hampton mortgage had been withdrawn first, then immediately thereafter the excess cash could have been taken. But this seems to overlook the purpose, namely, that the fund be made "sweet" by covering the defaulted bonds before other withdrawals could be made. Here, as the Master found, there was no cash excess; and the defaulted mortgage could be withdrawn only by appropriate substitution of proper securities. The proviso would then fulfill its intent in the elimination of defaulted securities in accordance with the dominant purpose of the arrangement to protect all bonds issued. For this reason, also, the cash releases were therefore improper and the Master was correct in

surcharging the Bank as Trustee for them in the sum of $1,045,250, plus interest.

It may be noted that the Bank urges vigorously a settled construction of the trust agreement made and acted upon by the parties at the time, contrary to our conclusion and in accord with the view of the district judge. But the parties were the Trustee and the debtor corporation; overlooked entirely are the bondholders for whom the protective provisions were drawn.

3. *From Rulings as to Interest, Expenses, and Costs.* The objectors also appeal from certain rulings of the court allowing interest on the amounts surcharged at 3 per cent only and only certain of the costs, while disallowing expenses to them. The Master had found that the Trustee was not guilty of fraud or bad faith "except as gross negligence may be said to be bad faith"; on this basis he recommended the interest award at the reduced rate. He also recommended that the Trustee be required to pay the costs of the proceeding, together with reasonable allowances for expenses, including counsel fees. The court struck out the findings of "gross" negligence, and then allowed interest at 3 per cent and disallowed expenses. In his decision the judge did provide that the Bank should pay the costs of the proceeding Later when a bill of costs was presented, he struck out the item for compensation of the Special Master (together with two other items not here disputed) and divided the remaining costs by one-half, allowing a total of $1,183.12. The objectors assert that both expenses and costs should be allowed, together with interest on the surcharges at the rate of 6 per cent per annum.

We are not inclined to upset the joint findings of good faith made below. The Trustee does appear to us negligent, whether we apply further descriptive adjectives or no; but it was not itself receiving the money or refusing to disgorge, as in Dabney v. Levy, 2 Cir., 191 F.2d 201, certiorari denied Levy v. Dabney, 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed.

665; cf. Dabney v. Chase Nat. Bank of City of New York, 2 Cir., 201 F.2d 635. The events happened back in the halcyon days of high finance before the legal responsibilities of indenture trustees had been judicially defined. Looking now at these matters by wisdom of hindsight we should not attempt to enforce penalties based on a standard unrealistically high for the era. At any rate, we do not think the conduct of the Bank such as to require the full measure of exaction or deprive the court of its discretion to allow interest at the lesser rate. President and Directors of Manhattan Co. v. Kelby, supra, 147 F.2d at page 479, note 33, and cases there cited.

The court's disposition of the matter of expenses and costs we find more troublesome. Such issues are normally within the discretion of the trial judge, which we are loath to disturb. Disallowance of expenses, i. e., substantially of counsel fees, may well follow the ruling on interest and rest on the finding of an absence of bad faith. But that measure of grace made all the more natural the court's first ruling that the Bank should bear the costs of the proceedings. We do not understand why the judge retreated from this position; the record vouchsafes no reason. It may well be that upon survey of the judgment he was impressed with the smallness of the award he was making against the Trustee as compared to that recommended by the Master. The Master had allowed nearly the entire amount claimed by the objectors, a total of $1,071,464.18, plus interest, while the court allowed a total of $159,216.66, plus interest—a substantial defeat for the objectors. Our judgment restoring the award to nearly that allowed by the Master would seem to leave no ground for denying costs and to make the reduction of the award by the full expense of its recovery substantially unjust. Ordinarily "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." F.R. 54(d). We think the direction otherwise here without justified grounds. Duke Power Co. v. Greenwood County, 4

Cir., 91 F.2d 665, 677–678, affirmed 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381; Gold v. Gold, 2 Cir., 187 F. 273, 274; Broffe v. Horton, 2 Cir., 173 F.2d 565, 566. As to the Master's compensation, taxable by the court, under F.R. 53(a), "the amount thereof shall be a taxable cost against the unsuccessful party." Civil Rule 5 of the United States District Courts for the Southern and Eastern Districts of New York; cf. N.Y.C.P.A. § 1518; Ex parte Peterson, 253 U.S. 300, 315, 40 S.Ct. 543, 64 L.Ed. 919. We hold, therefore, that the Trustee must pay the entire taxable costs of this proceeding, including the compensation of the Special Master.

### II. The Trustee-Bank's Appeal

■ 1. *From the Partial Sustaining of the Second Objection.* This is the Bank's attack on the surcharges for the releases of cash which we have discussed above under the objectors' appeal from the dismissal in substantial part of their second objection. The Bank challenges any surcharge, denying that any security was in default and relying upon certificates of nondefault given by the debtor to it.

Of the two mortgages found to be in default, the Hillman Hotel and the Elmhurst-Hampton mortgages, the first in the face amount of $675,000 became in default upon the nonpayment of $11,000 of principal due August 1, 1930, and, as found by the Master, remained so to the Bank's knowledge until May 27, 1931. Upon this finding the first six releases of cash from October 31, 1930, through April 27, 1931, were improper. To this the Bank makes several answers. Relying upon its conclusion—rejected by us above—that a default of 60 days or less was immaterial, it asserts that the default did not actually occur until January 2, 1931; and the 60-day period of grace would thus afford protection for the first five releases. The basis for its contention is that the mortgage actually did provide for the payment of installments of principal on January 1 and July 1. But the property was a summer hotel

deriving most of its income in the summer, and by a rider to the mortgage it was provided that the January installment would be deposited with the guarantor (the Prudence Company) on the preceding August 1. Failure to comply with this promise was surely a default in the mortgagor's obligations, as appears to have been settled in other Prudence cases, e. g., Prudence-Bonds Corp. v. State Street Trust Co., 2 Cir., 202 F.2d 555, 560. The Bank makes other claims: that the guarantor did collect the interest due August 1 and inadvertently failed to claim the principal due, and that the amount actually collected must be held by the guarantor in trust to satisfy the requirement of payment on the principal. None of these, it seems to us, can affect the basic and controlling fact that the mortgagor was not meeting its obligations as required.

■ To avoid the sixth or very substantial release of cash on April 27, 1931, the Bank contends that the default was cured by its sale on that date of the default to the guarantor for $11,000, together with a "junior participation" in the mortgage. The latter was an agreement by the Bank to accord the guarantor a participation in the mortgage to the extent of $11,000 in all respects junior to its own interests as trustee. But it could make no sale even before default, In re Prudence-Bonds Corp., 2 Cir., 102 F.2d 531, 534; and this seems only a plan whereby some one other than the obligor makes good the mere amount of the default in order to obtain a release and a weakening of the protection of the trust fund to the extent of the amount withdrawn, $525,450,000. Again the basic fact of the mortgagor's default remains.

■ The Bank also relies on a written expression of opinion by Prudence counsel that the transaction would be effective to erase the default and permit withdrawal of excess collateral; it cites Article V, § 1, of the trust agreement, protecting it from liability for action taken by it in good faith in accordance with the opinion of counsel. It did not,

however, actually rely on this opinion, since it sought the advice of its own counsel, who replied hesitantly that, although "this method of curing the default in the Hillman Company mortgage is not expressly provided for in the Trust Agreement and is perhaps not the most satisfactory method from the Trustee's point of view," yet he thought "that the risk which you run in complying with the Prudence Company's request is slight." So dubious a backing for so dubious a method favoring the guarantor, whose interest adverse to the bondholders was perfectly clear, can hardly be considered a good-faith reliance upon the opinion of the guarantor's counsel. In fact the debtor itself had suggested to the original trustee some two years earlier with regard to this provision of Article V, § 1, that "if an opinion of counsel is necessary, it should be the opinion of your counsel."

■ Surcharge for the first six releases being thus established, we turn to the situation as to the Elmhurst-Hampton mortgage, default in which has been held established below to support the surcharges for the remaining six cash releases from June 8 through August 17, 1931. This mortgage in the amount of $190,000 was divided by an ownership agreement into a senior participation of $160,000, denominated a first mortgage and held by the Trustee in the trust fund, and a junior participation of $30,-000, held by others. In March, 1931, the attorney for the junior owners, wishing to foreclose because real estate taxes due November 1, 1930, and interest on the mortgage due March 1, 1931, remained unpaid, sought through an officer of the debtor and the guarantor consent of the senior owner as required by New York law. So this officer, on behalf of the Trustee as senior owner, gave this consent in writing, together with authorization and instructions to foreclose the junior participation. On March 26, 1931, a summons and complaint and *lis pendens* of an action of foreclosure in the name of the Bank as trustee and the junior owners against the mortgagor (who was

not served) and others, including an intermediate transferee, who was notified, were filed in the office of the appropriate county clerk. Thereafter a title search showed that this transferee had itself transferred the record title to one Bortz by deed recorded on March 12, 1931. Consequently supplemental service was made on Bortz on May 12, 1931. The Elmhurst-Hampton mortgage provided that the whole of the principal sum should become due at the option of the mortgagee on default for 20 days in the payment of interest, but that written notice must be given of such acceleration of the principal. The Master has held that such notice was therefore not given until May 12, 1931.

At the hearings below the officers of the Bank denied all knowledge of these steps and no actual knowledge was brought home to them. It is true that on August 8 the attorney for the junior owners procured release of the mortgage papers by the Bank to him for the purpose of the action; but this was after all but the last cash release. The foreclosure went through, the premises were sold at foreclosure sale on October 9, 1931, and the junior owners received a small balance on their mortgage. The Bank did have knowledge of the defaults in payment of interest during the period covered by the cash releases from March 1 to October 20, 1931, because of the monthly collection statements it received early each month from the debtor. And the "certificates of non-default" which we discuss below were carefully limited to exclude reference to the interest defaults. On these facts both the Master and the district judge, albeit by somewhat different routes, held the Bank for the six releases made during the period of the default of this mortgage. The Bank challenges all the routes to this conclusion.

There are several theories urged in support of the result reached below. The one most extensively reasoned by the Master is that from the standpoint of the Trustee's obligation, the time when the power to call the principal became

operable determined the time of default. Although the judge rejected this ground, holding that default in obligation as to the principal did not occur until an actual call was made, the rationale of the Master appears to be sound. He argues that the power to call the principal and the power to draw down excess of collateral are both powers in trust, to be more strictly construed as between trustee and beneficiary than between the property owner and his mortgagee. We have recently had occasion to hold that indenture trustees, assuming the high obligations of a trustee to the investing public, should be held to a standard of conduct required of such fiduciary. Dabney v. Chase Nat. Bank of City of New York, 2 Cir., 196 F.2d 668, 671. So here, when the Trustee learned that collateral for the protection of its beneficiaries was in a weakened condition because of a default in the assumed obligation of the mortgagor, and it could proceed at once to protect its fund by taking legal steps to enforce the obligation, should it be able not merely to stand by, but also to weaken its fund by releasing cash? A negative answer seems more consistent with the obligations of a trustee. Moreover, it makes for the more coherent scheme of operation of the trust, for it avoids all question, such as occurred here, as to just when a call occurred and when its duty to protect its fund became critical. In fact, the Court of Appeals has so ruled against a company issuing guaranteed first mortgage certificates. Fisher v. Title Guarantee & Trust Co., 287 N.Y. 275, 280, 281, 39 N.E.2d 237. Judge Inch's distinguishing of this case on the ground that "Principal became due *ipso facto* upon a failure to pay interest" is not sound, for N.Y. Real Property Law § 254(2), McK.Consol.Laws, c. 50, treats mortgage clauses such as the one in question as granting only an option of call. and the case shows neither call nor action to foreclose the mortgage.

Judge Inch concluded that the institution of the foreclosure on March 27 was a sufficient act of acceleration of the principal, so far as concerns the Trustee,

and that notice to the titleholder was not required to fix rights against the latter. Here again, having regard to the fiduciary obligations assumed by the Trustee, the conclusion seems sound. The debtor and the guarantor were its agents for collection of the amounts due on the collateral in the trust fund, and they had the power and the duty to institute or authorize foreclosure in the name of the Trustee, as they did here. Had the Bank by its own officers started foreclosure, that would have been a call of the principal surely sufficient to put it on notice that its collateral was in default. When the same action is taken for it by its authorized agents, the result should be the same.

Finally our conclusion above, that there was no "clear day" and that mortgages in default as to interest or for less than 60 days still cannot be used in computing excess collateral, leads to the same result. We have already ruled that there was no excess collateral justifying the large withdrawals of June 8, 1931; and the grounds taken by us in supporting the Master and reversing the trial court on this issue require the result reached below unless, indeed, the certificates of non-default, so strongly relied on by the Bank, grant absolution.

Authority for these certificates is found in the last sentence of the second full paragraph of Article I, § 6, supra: "The Trustee may accept as conclusive the written statement of any officer of the Corporation as to whether or not any securities deposited in the Trust Fund are in default in the payment of principal or interest." Certificates were furnished when the releases were requested, and an issue has been made of their adequacy. The debtor's letter asking for the first release, that on October 31, 1930, contained no statement; those for the releases between November 29, 1930, and April 27, 1931, contained statements advising the Trustee that "none of the securities deposited in the Trust Fund are in default in the payment of principal or interest for sixty days or more"; while those for the releases be-

tween June 8 and August 17, 1931, omitted any reference to "interest." Both the Master and the district judge found that the Bank did not accept these statements as conclusive. It had full knowledge of the default in the Hillman mortgage which we have set forth above; and it had full knowledge of the default in interest on the Elmhurst-Hampton mortgage from March 1 on and that the entire principal was and had been callable since March 20, 1931. Such exculpatory provisions should be "strictly construed," Prudence-Bonds Corp. v. State Street Trust Co., supra, 2 Cir., 202 F.2d 555, 563, citing 1 Restatement, Trusts § 222 (1935); and such knowledge might in any event be sufficient, whatever the notices. But it is apparent that on the construction we have given the trust agreement, the notices were quite inadequate; they left unmentioned the essential feature of the status of the interest payments. We need not consider their adequacy, therefore, had the issue actually been one turning only on securities in default for 60 days.

■■■ 2. *From the Sustaining of the Third Objection.* The third objection involves the Bank's acts on six different occasions from February 23 to December 9, 1932, in accepting bonds of this series for cancellation in lieu of cash collected by the debtor on account of principal on mortgages in the trust fund. The Master recommended a surcharge on the last three items only because they alone occurred after May 1, 1932, the date on which the debtor defaulted in the payment of principal of this series of bonds. And as to one of these items he allowed $500 only because the foreclosed premises were ultimately restored to the trust fund at that cost. The total surcharge he recommended on this objection was $3,966.68.

Judge Inch upheld the Master on this allowance, but ruled further that the objection should be sustained also as to the first three items, since the Bank had notice on or about January 2, 1932, to the effect that the maturing bonds would not be paid when due. It is true that an

"event of default," upon which certain rights such as acceleration of the maturity date of all issued bonds might turn, would not occur until eighteen months after such principal default; but the trust agreement makes a clear distinction between a default and an event of default. Article IV, § 1, and Article V, § 1. In President and Directors of Manhattan Co. v. Kelby, supra, 147 F.2d at pages 478, 479, we held that the trustee there should not have accepted bonds for cancellation after this notice of default; and the Bank's attempts to distinguish that case are not persuasive. In addition, as Judge Inch points out, the cancelled bonds were those only authenticated after receipt of the notice and never issued or sold to the public. Hence this was merely a device to permit the debtor to retain cash which it should have deposited in the trust fund. We agree with the judge when he says: "The Bank, as Trustee, should not have countenanced these transactions."

The court therefore correctly increased the surcharge under the third objection by $12,749.98 to a total surcharge of $16,716.66.

■■■ 3. *From Denial of the Defense of Partial Restoration.* Between July 20, 1931, and November 10, 1931, the debtor restored to the trust fund $19,375 without withdrawals therefor. For this amount the Bank claims credit. But the Master declined to allow it for lack of a showing that the amounts restored had any connection with the cash released. Various other trust transactions occurred thereafter and were in part supported by the deposited bonds; thus new bonds to the amount of $46,900 were authenticated between December 3, 1931, and October 31, 1932. There would be no reason for allowing restoration to the losses here only thus to promote a deficit elsewhere in the fund and the Bank does not show that this would not result.

*Summary and Direction.* The result of our holdings explained above is that the Bank's appeal is rejected, while on the objectors' appeal the judgment stands except in two particulars. We have rul-

ed that the second objection must be sustained in full and the Bank surcharged for all the twelve cash releases from October 31, 1930, through August 17, 1931, together with interest on each at 3 per cent from the date when it was made; and we have further ruled that the Bank must pay all the costs of this proceeding, including the compensation to the Master.

Accordingly on the Bank's appeal the judgment is affirmed; on the objectors' appeal it is reversed for the additional awards here directed.

**HANN v. HAWK.**

**No. 14564.**

United States Court of Appeals Eighth Circuit.

Sept. 17, 1953.

Richard W. Smith, Lincoln, Neb., for Henry Hawk.

Before SANBORN and JOHNSEN, Circuit Judges.

PER CURIAM.

This Court on July 20, 1953, filed its opinion in this case vacating the judgment appealed from and remanding the case to the District Court with directions to dismiss it. This upon the ground that, owing to the death of Henry Hawk on April 21, 1953, the case, which involved the question of the legality of his release from State custody in a habeas corpus proceeding, had become moot.

Counsel, who had been appointed by the Court to represent Hawk, filed on July 31, 1953, a petition for rehearing and a request for instructions with respect to his authority to proceed further, in view of Hawk's death. Neola Wiepert, Administratrix of the Estate of Henry Hawk, appointed by the State District Court of Pottawattamie County, Iowa, has lodged with the Clerk of this Court a certified copy of Letters of Administration and a "Joinder in and Adoption of Petition for Rehearing filed by Attorney R. W. Smith." Leave to file these papers is granted.

The petition for rehearing has been considered on the merits, and is denied. So far as this Court is concerned, the case is terminated. Our decision is, of course, subject to review by the Supreme Court on certiorari. Counsel for Hawk was appointed by the Court to represent him until the final termination of this litigation. We regard his official responsibility as having terminated, but, for the purpose of enabling him to seek a review of our decision if his sense of

duty and responsibility as appointed counsel calls upon him to take that course, he is authorized, in so far as this Court can grant authority, to petition the Supreme Court for certiorari.

Judge RIDDICK did not participate in this opinion, owing to his death on July 31, 1953.

## CHASSEN v. UNITED STATES.

### No. 190, Docket 22594.

United States Court of Appeals
Second Circuit.

Argued May 14, 1953.

Decided Sept. 4, 1953.

Writ of Certiorari Denied Jan. 4, 1954.

See 74 S.Ct. 309.

Levin & Weintraub, New York City (Benjamin Weintraub and Eugene N. Sosnoff, New York City, of counsel) for appellant.

H. Brian Holland, Ellis N. Slack and I. Henry Kutz, Special Assistants to the Atty. Gen. (Frank J. Parker, U. S. Atty., and Nathan Borock, Brooklyn, New York, of counsel) for the United States.

Before CHASE, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The facts are set forth in the opinions of the referee in bankruptcy and of the district judge, both reported in 103 F. Supp. 351. It there appears that, on February 8, 1950, when the United States, by sheer inadvertence, paid the trustee in bankruptcy refunds of taxes in the amount of $35,373.43, the United States had on file in the bankruptcy proceedings a proof of claim, timely filed, for taxes on which there was owing $24,-383.71.[1] This proof of claim stated that there were "no set-offs or counterclaims." Admittedly, the government could then have stated the actual facts. It did not do so until March 1951. Its statement at that time was the equivalent of an amendment, of its proof of claim, made after the expiration of the statutory period for the filing of claims.

The question, then, is whether such an amendment is valid. Our recent opinion in Rumsey Manufacturing Corp. v. United States, 2 Cir., 206 F.2d 565, serves to answer this question in the affirmative. For here no one changed his position to his detriment in reliance on the previous failure to state the facts.[2] Indeed, here

1. The adjudication in bankruptcy occurred on March 23, 1949. On May 10, 1949, the United States filed a claim, for taxes due, in the amount of approximately $246,000. Actually, there was then owing to it the amount of $24,383.71; an amended proof of claim for this smaller amount was filed October 30, 1950.

2. See also Lewith v. Irving Trust Co., 2 Cir., 67 F.2d 855, 856; In re Meade Tool

the justification for permitting the amendment is even stronger than in the Rumsey case, for here all parties concede the claimant's inadvertence.[3] The allowance of an amendment in the circumstances does not turn on the fact that the claimant is the United States.

Affirmed.

CLARK, Circuit Judge, concurring in the result.

## RUBY v. BISHOP et al.
## No. 4593.

United States Court of Appeals
Tenth Circuit.
Aug. 19, 1953.

& Die Co., 6 Cir., 164 F.2d 228, 230–231; In re Prindible, 3 Cir., 115 F.2d 21, 23; Hartford Accident & Indemnity Co. v. Coggin, 4 Cir., 78 F.2d 471, 477; Union National Bank v. McKey, 7 Cir., 102 F. 662; In re Myers, D.C.Ind., 99 F. 691; cf. Hutchinson v. Otis, 190 U.S. 552, 555, 23 S.Ct. 778, 47 L.Ed. 1179; U. S. National Bank v. Chase National Bank, 331 U.S. 28, 35–36, 67 S.Ct. 1041, 91 L. Ed. 1320.

In so far as In re Mauch Chunk Brewing Co., 3 Cir., 131 F.2d 48, 143 A.L.R. 451, may be considered *contra*, we disagree with it.

3. To the effect that waiver is the "intentional relinquishment of a known right," see Lehigh Valley R. Co. v. Providence-Washington Insurance Co., 2 Cir., 172 F. 364, 365; Clark v. West, 193 N.Y. 349, 360, 86 N.E. 1.

Duke Duvall and Delmer L. Stagner,
Oklahoma City, Okl., for appellant.

M. W. McKenzie, Oklahoma City, Okl. (H. Barney Crawford, Oklahoma City, Okl., on the brief), for appellees, Wilton J. and Leanna J. Miller and Local Federal Savings & Loan Assn.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Appellants brought this quiet title and ejectment action as successors to the remaindermen under the will of Lou B. Pasell against the Appellees whose asserted interests are derived from the powers of sale and disposition granted under the terms of the will.

Federal jurisdiction is based upon existing diversity of citizenship and requisite amount in controversy.

The testatrix, Lou B. Pasell, died April 1, 1921 seized of Lots 7, 8, 9 and 10, Block "N", Oak Park Addition to Oklahoma City, Oklahoma. The will devised the property to her husband, Henry Pasell, "to be used and enjoyed by him with the right to sell and dispose of same and use so much thereof, either principal or income, as he may desire during his lifetime, with the direction and provision that if any of said property, or the proceeds thereof, remain in the ownership and possession of the said Henry Pasell at the time of his death that the same then be distributed equally to my two children, Lyda L. Board, my daugher, and Frank S. Ruby, by son, equally, that is, share and share alike."

Holding that the will created a life estate in Henry with powers of sale and disposal and that deeds subsequently executed by him in pursuance of such powers operated to effectively extinguish the rights of the remaindermen, the trial court gave judgment for the Defendants-Appellees, and this appeal is from that judgment.

At the outset the Appellees take the position that when the will is construed according to the applicable canons of construction it must be deemed to have vested a fee simple title in Henry, thereby giving him absolute powers of sale

and disposal; and that deeds executed by him are therefore effective to convey good and valid title to the Appellees' predecessors in interest. This position, if tenable, is of course dispositive of the case.

■ Under the statutory law of Oklahoma "every estate in land which shall be granted, conveyed or demised by deed or will shall be deemed an estate in fee simple and of inheritance, unless limited by express words." Title 16 O.S.A. § 29. And in consonance with the statutory law, Oklahoma follows the general rule of construction that where doubtful words of devise are coupled with clear and distinct powers of absolute disposal, the devisee takes a fee simple title even though there may be subsequent words of limitation over of what remains after the first taker's death, Hicks v. Fairbanks Heirs, Okl., 256 P.2d 169. But these settled rules of construction do not preclude the creation of a life estate with unrestricted powers of disposition and a limitation over to remaindermen if the words used to create the estate are as clear and distinct as those creating the power and remainder. See cases collected in Annotations: 36 A.L.R. 1177 and 76 A.L.R. 1153.

■ In other words a power of absolute disposal is not inconsistent with a life estate, and a gift of the power to dispose of the whole estate annexed to an estate for life with remainder over confers upon the life tenant plenary power to convey the fee upon the terms of the power granted. Gildersleeve v. Lee, 1921, 100 Or. 578, 198 P. 246, 36 A.L.R. 1166, cited in the Oklahoma case of Miller v. Irey, 150 Okl. 240, 1 P.2d 654.

■■ In its final decree of distribution the Oklahoma County Court distributed the estate to Henry "in fee" and the Appellees contend that the final order of the court constituted a binding adjudication of a fee simple title in Henry. It is true that the decree of the court did use the words "fee simple" in describing the estate devised and distributed, but it did not stop there. It went on in the lan-

guage of the will to recite that the property in question was distributed in accordance with the provisions of the will to Henry Pasell in "fee simple to be used and enjoyed by him, with the right to sell and dispose of the same, or so much thereof, * * * as he may desire during this lifetime, and * * * if any of the property or the proceeds thereof remain in his ownership or possession at the time of his death that the same become the property of the two children", share and share alike.

When the decree is considered in accordance with the clear language of the will, we think the words "fee simple" must be said to have been inadvertently used to describe the nature of the estate devised. When the phrase is considered in its proper context, it becomes unmistakably plain that instead of extinguishing the rights of the remaindermen under the will the decree undertook to recognize and preserve such rights.

When the critical words of devise are considered in connection with the manifest intention of the testatrix we think they have the clear effect of devising a life estate in the husband with power to sell and dispose of the property for his beneficial use and a limitation over to remaindermen. And, construed in the light of the dual purposes of the testatrix it also seems clear enough that the power of disposal for beneficial use did not include the power to cut off the remaindermen by a gratuitous disposition either by gift inter vivos or by will. Rosenberg v. Baum, 10 Cir., 1946, 153 F.2d 10; King v. Hawley, 113 Cal.App. 2d 534, 248 P.2d 491; Pearson v. Orcutt, 106 Kan. 610, 189 P. 160; Stocker v. Foster, 178 Mass. 591, 60 N.E. 407; Parker v. Lloyd, 321 Mass. 126, 71 N. E.2d 889; 2 A.L.R. 1243, 1276, 1317; 27 A.L.R. 1381, 1384, 1388; 69 A.L.R. 825, 830, 837; and 114 A.L.R. 946, 950, 957. We have then a life estate with a conditional power of disposal and a remainder over. Morford v. Diffenbacker, 54 Mich. 593, 20 N.W. 600; Ashbaugh v. Wright, 152 Minn. 57, 188 N.W. 157; Larsen v. Johnson, 78 Wis. 300, 47 N.W. 615.

The Appellants take the position that the powers of sale and disposal for beneficial use created in the will are limited to sale or disposition for a valid consideration, and invoking the rule that the burden of proving a valid exercise of the power rests upon the party claiming thereunder, they assert the Appellees have failed to show that the conveyances by Henry were within the powers of disposition granted under the will. And see Emery v. Emery, 1927, 325 Ill. 212, 156 N.E. 364, 365; Lord v. Smith, 1936, 293 Mass. 555, 200 N.E. 547; Stocker v. Foster, 1901, 178 Mass. 591, 60 N.E. 407.

The rule placing the burden of proof upon the one claiming under a power to show a valid execution is but a recognition of the still broader rule requiring clear and convincing proof of an intention to exercise a power. Lee v. Simpson, 134 U.S. 572, 10 S.Ct. 631, 33 L.Ed. 1038, 72 C.J.S., Powers, § 40(c); 91 A.L.R. 434; 127 A.L.R. 249. And the rule is corollary to another rule of ancient and venerable origin to the effect that if one possessed of an interest and a power makes a conveyance of the subject matter without reference to the power he is presumed to have conveyed only his interest and not to have executed his power. Barnard v. Moore, 71 Colo. 401, 207 P. 332; Mutual Life Ins. Co. v. Shipman, 119 N.Y. 324, 24 N.E. 177; Weinstein v. Weber, 178 N.Y. 94, 70 N.E. 115; Lardner v. Williams, 98 Wis. 514, 74 N.W. 346; Phillips v. Brown, 16 R.I. 279, 15 A. 90; Lister v. Lister, 47 R.I. 366, 133 A. 437. This so-called power plus interest rule is another recognition of the requirement for manifestation of an intent to exercise the power. See In re Smith's Will, 279 App.Div. 140, 108 N.Y.S.2d 290.

To overcome this presumption and to cast the burden of showing the invalidity of the challenged conveyances upon the Appellants, Appellees rely upon 60 O.S.A. § 234 providing that "Every instrument executed by the holder of a power, conveying an estate or creating a charge which such holder would have no

right to convey or create except by virtue of his power, is to be deemed a valid execution of the power, even though not recited or referred to therein." But this statute has been repeatedly construed by the court of the state of its origin as being applicable only to conveyances by the donee of a naked power without an interest and as having no effect whatsoever on the so-called power plus interest rule. Mutual Life Ins. Co. v. Shipman, supra; In re Smith's Will, supra. The Oklahoma court has not construed the statute but we apprehend that it would follow the settled construction of the act.

■ But quite apart from statutory aids or presumptions the object of our inquiry is the ascertainment and effectuation of the intention of the donee of the power. And if his intent to exercise the power according to its terms and conditions clearly appears upon the face of the will, deed or instrument, as where the deed embraces the subject matter of the power or is inoperative without it, it will be deemed not only to have conveyed the interest but executed the power as well. Wilson v. Singleton, 1951, 410 Ill. 611, 103 N.E.2d 72; Headley v. Indianapolis Southern R. Co., 1915, 58 Ind.App. 592, 108 N.E. 593; Taylor v. Taylor, Mo.Sup.1951, 243 S.W.2d 310; Busch v. Plews, 1952, 19 N.J.Super. 195, 88 A.2d 264; Board of Home Missions of Presbyterian Church in United States of America v. Saltmer, 1939, 125 N.J.Eq. 33, 4 A.2d 69; Hood ex rel. North Carolina Bank & Trust Co. v. North Carolina Theaters, Inc., 1936, 210 N.C. 346, 186 S.E. 345, 72 C.J.S., Powers, § 40(b) (5); Reeside v. Annex Bldg. Ass'n, 165 Md. 200, 167 A. 72, 91 A.L.R. 433; Meister v. Francisco, 233 Wis. 319, 289 N.W. 643, 127 A.L.R. 248.

■ Henry executed a deed to his third wife, Hattie, in 1926 but it was expressly cancelled by a divorce decree in 1928. When Henry married his fourth wife, Lillian Thomas in 1930, there were three mortgages on the devised property totaling $3227.37 all executed by Henry and his previous wives and on which Lillian was not liable. On the 19th day of August, 1930 Lillian paid $2419.14 and Henry paid $852.22 to liquidate and discharge the three mortgages on the entire property. On the same day Henry and Lillian conveyed the property to Vinitta Wigley who immediately reconveyed to Henry and Lillian as joint tenants. In March, 1937 Henry conveyed by warranty deed the West 17 feet of Lot 9 and all of Lot 10 to Lillian. The deed recited a consideration of $2700.00 but no revenue stamps were affixed. Lillian died the same year and the West 17 feet of Lot 9 and Lot 10, known as the West Property were distributed to Henry by decree of the County Court in accordance with Lillian's Will. In 1938 Henry married his fifth wife, Addie Lee, and in May, 1944 he executed two warranty deeds to his wife, Addie Lee, one covering the West 22 feet of Lot 9 and all of Lot 10 (West Property) and Lots 7 and 8 and the East 3 feet of Lot 9 (East Property). Each of the deeds recited a consideration of "One Dollar and other valuable presents," but no revenue stamps were affixed. Soon after the execution of these deeds Henry died leaving a will in which he devised all of his property to Addie Lee. Addie Lee died in January, 1946 leaving a will devising all of her property to her sons and daughters through whom the Appellees derive their interest.

None of the deeds referred to Henry's power of disposition. But they did embrace the subject matter of his powers, and the deeds to Lillian and Addie Lee purported to convey and warrant a fee simple title; and they were inoperative without the execution of the powers. Henry's intention to execute his powers was therefore too clear for doubt and the only remaining question is whether they were executed in accordance with the terms and conditions thereof.

Denying that any of the deeds was for a valid consideration and hence for Henry's beneficial use the Appellants contend that the attempted conveyances were

mere gratuitous dispositions and therefore not within the powers conferred upon Henry by Lou's will.

To show a valid execution of the powers and the conclusiveness of the deeds on their face, the Appellees invoke 60 O.S.A. § 266 providing: "Every power of disposition is deemed absolute, by means of which the holder is enabled in his lifetime to dispose of the entire fee, in possession or in expectancy, for his own benefit." Here the donee was empowered to dispose of the entire fee for his own benefit, and by the execution of the deeds he is deemed to have conveyed absolutely. But the statute relates only to the power and not to the title vested in the donee. Hasbrouck v. Bookstaver, 130 App.Div. 378, 114 N.Y.S. 949. It does not serve to enlarge a life estate into a fee. In re Brower's Estate, 278 App. Div. 851, 104 N.Y.S. 658, affirmed 304 N.Y. 661, 107 N.E.2d 589. Nor does it preclude the testatrix from providing the terms, mode and conditions upon which the power to dispose of the fee shall be exercised. Title 60 O.S.A. § 231. It does not inhibit the manifest intention of the testatrix to restrict or condition the exercise of the power to convey the entire fee. In short, it does not make absolute that which is plainly conditional. We think the statute does no more than to raise a legal presumption that the power to convey the fee when exercised is absolute. It does not dispense with inquiry into the question whether the prescribed conditions under which the power is to be exercised have been met.

The power of the life tenant to sell and dispose for his beneficial use and enjoyment was deemed within the purview of 60 O.S.A. § 266 in Miller v. Irey, supra, and Arnold v. McAuliffe, 201 Okl. 639, 209 P.2d 866. But in each case the Oklahoma court was careful to point out that the conditions of the power had been met by the conveyance in fee for a valid consideration.

Appellees also rely upon Title 60 O.S.A. § 262 which provides that: "Where an absolute power of disposition, not accompanied by any trust, is given to the owner of a particular estate for life or years, such estate is changed into a fee, absolute in favor of creditors, purchasers and incumbrancers, * * * " The effect of this statute as applied here is said to change the life estate in Henry to a fee absolute in favor of the Appellee purchasers and incumbrancers.

In Watkins v. French, 1931, 149 Okl. 205, 299 P. 900, 76 A.L.R. 1153, the life tenant was given full power to sell and dispose of the property in any manner and on any terms that seemed to her best with no restrictions except as to such residue and remainder as may be retained by her at the time of her death. Making application of the statute, the court held that the power of disposition being absolute, the life estate was changed to a fee in favor of the incumbrancers. See also In re Inheritance Tax on Dale's Estate, 1934, 167 Okl. 240, 29 P.2d 88; Auer v. Brown, 1904, 121 Wis. 115, 98 N.W. 966; 36 A.L.R. 1177, at page 1228. But the statute plainly presupposes an absolute not a conditional power of disposition. It does not enlarge upon a conditional power of disposal and it is inapplicable to a life estate with such powers and an express remainder resulting in a trust. 33 Am.Jur., Life Estates, Remainders, etc., Page 494, §§ 31 and 32.

According to the findings of the trial court, soon after Henry and Lillian were married in 1930, they discussed liquidating the mortgages on the subject property. And Lillian agreed to pay off, or to help pay off, the mortgages with her own funds in consideration of a deed to the West 17 feet of Lot 9 and all of Lot 10 referred to as the West Property. And $2419.14 of her separate funds was used to help discharge the three mortgages on the entire property. The Wigley transaction was intended to effect a joint tenancy in the property, and soon thereafter Lillian spent about $300.00 repairing the West Property. The trial court specifically held that the Wigley deeds did not operate to cut off the rights of the remaindermen but made no findings with respect to the warranty deed from Henry to Lillian in March, 1937.

While that deed was not executed for seven years after Lillian had used her money to discharge the mortgages, it was in clear recognition of the understanding between them that she would have a deed covering the West Property.

After the mortgages were discharged and the Wigley deeds executed, Henry and Lillian joined in mineral deeds to the property for the sum of approximately $5500.00 and the evidence shows that Lillian received at least a part of the proceeds of this sale. It is suggested that Lillian received all of the money she had expended in the discharge of the mortgages before the execution of the deed in 1937 and that the monies paid to discharge the mortgages could not constitute a valid consideration for the 1937 deed. But if she paid a valid consideration in 1930 for the deeds which were not executed until 1937, the consideration did not fail merely because she received an amount equal to or in excess of the con- ̃sideration paid as increment from the ownership of the property. It does not negative the clear inference that the mortgages were discharged with Lillian's money for Henry's use and benefit. We think the evidence is entirely sufficient to show that the deed to Lillian in 1937 covering the West 17 feet of Lot 9 and all of Lot 10 was not a gratuitous disposition but a bona fide execution of the power of sale and disposal for a valid consideration and that it operated to cut off the rights of the remaindermen. This being so, he inherited a fee simple title to that property under Lillian's will.

In addition to the recitations of "One Dollar and Other Good and Valuable Presents" in the deeds to Addie Lee the Appellees offered the testimony of Addie Lee's daughters and devisees of her will to the effect that Henry had told them their mother had put money into the property and in order to make her feel secure he would deed the property to her. And there was further testimony by the children to the effect that Henry wanted Addie Lee to have the property, or what was left of it when he was gone, and that he wanted her children to have what was left after Addie's death. There was tes- timony by one of the daughters to the effect that Addie had told her that she had bought the property and paid for it. There was no evidence of the amount of the consideration paid for the property, but the trial court specifically found that a valid consideration passed for the two deeds. For the Appellant there was testimony by a neighbor to the effect that Henry had expressed the intent to defeat the remaindermen by the execution of the deeds and that the deeds to Addie Lee were executed for that purpose.

On these findings the trial court concluded that although the conveyances from Henry to his subsequent wife, Addie Lee, were to be scrutinized more closely than a conveyance to a stranger, they nevertheless constituted a valid execution of the power to sell and dispose of the properties under Lou B. Pasell's will, and operated to extinguish and cut off the rights of the remaindermen. And finally taking the view that the plaintiff had the burden of proving a better title in herself than that of the defendants it was the court's conclusion that the burden of showing a better title was not sustained by the evidence.

All of the testimony bearing upon the consideration for the deeds to Addie was the rankest hearsay. It was little more than family and neighborhood gossip, and it was not made admissible simply because it happened to be the best evidence. Certainly it is not competent to settle land titles.

To support the findings of the trial court the Appellees invoke the statutory rule to the effect that a written instrument is presumptive evidence of a consideration and the burden of showing want of consideration sufficient to support an instrument lies with the person seeking to invalidate it. Title 15 O.S.A. §§ 114 and 115. These statutes appear in the code under the title and chapter on Contracts. No cases are cited and we have found none making application to conveyances of real estate. It is the law in Oklahoma that recitals of consideration in a deed of conveyance, while presumptive evidence as between the parties, is purely hearsay as between parties

claiming under the deed or instrument of conveyance and strangers to the title. Adams Oil & Gas Co. v. Hudson, 55 Okl. 386, 155 P. 220; Van Winkle v. Van Winkle, 56 Idaho 588, 57 P.2d 692; Davis v. Kleindienst, 64 Ariz. 251, 169 P. 2d 78.

The Appellees derive their title from the life tenant's power to dispose of the entire fee for his beneficial use and the burden is upon them to show a valid exercise of that power according to its tenor. To meet that burden they have offered warranty deeds purporting to convey a fee simple title which we construe as manifesting an intent to execute the full powers; and we have held the deed to Lillian covering the West Property within the terms and conditions of those powers. While the separate deed to Addie Lee covering the East Property stands without evidential support of valid consideration, it was an execution of the power by means of which the holder was enabled to dispose of the entire fee, and that power is deemed absolute, when executed for his own benefit. A legal presumption was thus raised in favor of the validity of the deed to convey a fee simple title. Clothed with that legal presumption, the defendants met the burden of showing a valid execution of the power to convey the fee simple title to the East Property. And there being no competent proof to dissipate the legal presumption, title of the Appellees must be sustained.

The judgment is affirmed.

**HORTON v. UNITED STATES.**
**No. 14406.**

United States Court of Appeals
Fifth Circuit.

July 10, 1953.

Rehearing Denied Aug. 6, 1953.

Writ of Certiorari Denied

Nov. 30, 1953.

See 74 S.Ct. 233.

M. B. Grace, Birmingham, Ala., for appellant.

Russell, Chapin, Atty., Department of Justice, Washington, D. C., John D. Hill, U. S. Atty., William L. Hogue, Asst. U. S. Atty., Birmingham, Ala, Joseph D. Guilfoyle, Acting Asst. Atty. Gen., D. Vance Swann, Atty., Department of Justice, Washington, D. C., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RUSSELL, Circuit Judges.

BORAH, Circuit Judge.

This appeal is from a judgment for the United States, defendant, below, in an action for insurance proceeds brought by Anna Horton, the beneficiary named in a policy of National Service Life Insurance, certificate No. N–11 629 671, issued by the defendant upon the life of John Horton while he was in the military service.

The insured John Horton, was inducted into the military service of the United States on October 5, 1942. He was discharged on October 13, 1945, because of service connected disability, and died on July 19, 1948, from hemorrhage caused by cancer of the pancreas. Premiums on the policy were paid through October, 1945, by deductions from insured's service pay. On September 24, 1945, insured applied to the Veterans Administration for a waiver of premiums under Section 602(n) of the National Service Life Insurance Act of 1940, as amended August 1, 1946, 38 U.S.C.A. § 802(n), because of continuous total disability. This application was granted by a decision rendered on July 11, 1946, and insured was notified that he was entitled to waiver from payment of premiums from February 9, 1945, to November 13, 1945, and there was refunded to him the money which had been deducted from his pay to pay premiums during the period of time that they were waived. No premiums on that insurance were paid on December 1, 1945, or at any time during the life of the veteran nor did the veteran at any time subsequent to November 13, 1945, file any application for waiver of premiums.

Within one year subsequent to the death of the insured, appellant filed with the Administrator of the Veterans Administration an application for waiver of premiums which application was denied on the ground that the insurance had lapsed on December 1, 1945, for non-payment of premiums. On appeal this deci-

sion of the Administrator was affirmed by the Board of Veterans Appeals. Having exhausted her administrative remedies appellant filed this action in the District Court claiming that she was entitled to the proceeds of the policy because the veteran was totally disabled at the time he filed his application with the Veterans Administration for waiver of payment of premiums and by reason thereof his policy continued in force without payment of premiums. In the alternative it is claimed that insured's failure to make timely application for waiver of premiums or his failure to submit satisfactory evidence of the existence or continuance of total disability was due to circumstances beyond his control.

The District Court was of opinion that the right of waiver of insurance premiums under Section 802(n) permitting same in event of total disability, is not self-executing upon the occurrence of disability, but operates only after application therefor is made and granted. He accordingly concluded that after the termination of waiver of premiums by the Veterans Administration, the insured was obligated to begin paying premiums again and if he desired thereafter a waiver of premiums or an extension of that waiver it was incumbent upon the veteran to make new application therefor; that Horton thereafter failed to file a timely application for the continued waiver of premiums and that his failure to do so was not caused by circumstances beyond his control. For these reasons and on the authority of the decisions [1] of this Court to which he referred, the District Court directed a verdict for the defendant.

Appealing from the judgment that was entered on the jury verdict appellant contends that this court should determine and hold that because the veteran became continuously and totally disabled his policy continued in force without payment of premiums. In support of this contention it is argued that Horton complied with the statute which requires the filing of but one application for waiver of premiums; that the Veterans Administration had no authority to limit the waiver without examining the insured as the statute requires, to determine whether or not the total disability had ceased; and had no right or authority to lapse the insurance until the statute had been complied with and the Administrator had determined that the total disability had ceased. In the alternative it is claimed that the insured's failure to file a timely application for the continued waiver of premiums was due to circumstances beyond his control. We do not at all agree.

██ The statute [2] vests in the Administrator of Veterans Affairs, authority to issue regulations giving waiver and discontinuance of waiver of premiums on National Service Life Insurance policies. Unless inconsistent with the law, such regulations have the force and effect of law and are provisions of the insurance contract between the Veterans Administration and the veteran. Federal Crop Insurance Corporation v. Merrill, 332 U. S. 380, 68 S.Ct. 1, 92 L.Ed. 10, 175 A.L.R. 1075; Jones v. United States, 8 Cir., 189 F.2d 601. The pertinent regulation which was effective on the date the determination was made in the instant case that waiver should be discontinued is set forth in the margin.[3] We find noth-

---

1. Scott v. United States, 5 Cir., 189 F.2d 863, certiorari denied 342 U.S. 878, 72 S.Ct. 169, 96 L.Ed. 660; Aylor v. United States, 5 Cir., 194 F.2d 986; Walker v. United States, 5 Cir., 197 F.2d 226.

2. 38 U.S.C.A. §§ 802(n), 808.

3. Veterans Administration Regulation 3442 (38 C.F.R., 1944 Cum.Supp. 10.3442) provides:
   "*Discontinuance of premium waiver.* The Administrator may require proof of continuance of total disability at any time

when he may deem same necessary. In the event it is found that an insured is no longer totally disabled the waiver of premiums shall cease as of the date of such findings; (or in the event a finding that the insured is no longer totally disabled is made at the same time a finding is made of total disability entitling the insured to a waiver of premiums while so disabled, the waiver of premium shall cease as of the date on which total disability ceased). After a waiver of pre-

miums has ceased the insurance may be continued by payment of premiums, the due date of the first premium payable being the next regular monthly due date of the premiums under the policy; however, the insurance shall not lapse prior to date of expiration of the grace period allowed for the payment of such premium, or prior to the expiration of thirty-one days after date of notice to the insured of the termination of the premium waiver whichever is the later date. Such notice shall be sent by registered mail, return receipt requested, advising of the due date of the first premium payable after termination of the waiver and of the amount of premiums payable. Sufficient notice within the provisions of this regulation will be deemed to have been given when such letter reaches the insured's last address of record, and the failure of the insured to furnish a correct current address at which mail will reach him promptly shall not be grounds for a further extension of time for payment of premiums under this paragraph: * * *."